# MAXWELL LAND-GRANT CASE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF COLORADO.

Argued March 8, 9, 10, 11, 1887. — Decided April 18, 1887.

It does not satisfactorily appear that the grant of Governor Armijo of 1841 to Beaubien and Miranda, since ascertained to amount to 1,714,764.94 acres, was of that character which, by the decree of the Mexican Congress of 1824, was limited to eleven square leagues of land for each grantee.

It does appear that, though the attention of Congress was turned to this question, it confirmed the grant in the act of June 21, 1860, to the full extent of the boundaries as described in the petition of claimants.

In such case the courts have no jurisdiction to limit the grant, as the Constitution, by Article IV, § 1, vests the control of the public lands in Congress. *Tameling* v. *United States Freehold Co.,* 93 U. S. 644.

While courts of equity have the power to set aside, cancel, or correct patents or other evidences of title obtained from the United States by fraud or mistake, and to correct under proper circumstances such mistakes, this can only be done on specific averments of the mistake or the fraud, supported by clear and satisfactory proof.

The general doctrine on this subject is, that, when in a court of equity it is proposed to set aside, to annul, or correct a written instrument, for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal and convincing, and it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt.

Where the purpose is to annul a patent, a grant, or other formal evidence of title from the United States, the respect due to such an instrument, the presumption that all the preceding steps required by law had been observed, the importance and necessity of the stability of titles dependent on these official instruments, demand that the effort to set them aside should be successful only when the allegations on which this attempt is made are clearly stated and fully proved.

In this case the evidence produces no conviction in the judicial mind of the mistakes or frauds alleged in the bill, and the decree of the Circuit Court dismissing it is affirmed.

THE United States filed this bill in equity to set aside a patent dated May 19, 1879, granting to Charles Beaubien and Guadalupe Miranda, 1,714,764.94 acres of land in New Mexico and Colorado. The location of the land is shown on Map

No. 2, in the opinion of the court. After the taking of proof by complainant an amended bill was filed December 5, 1883. The respondents demurred, and the demurrer being overruled answered, and, after hearing, the bill was dismissed. From this decree the United States appealed.

The Republic of Mexico in 1841 made a grant of land to Beaubien and Miranda, accompanied by juridical possession, according to the forms of Mexican law. A sketch of the official diseño, forming part of the giving of possession is in the opinion of the court, Map No. 1. The description will be found in the opinion of the court, *post,* 361.

On the 15th of September, 1857, the surveyor general of New Mexico, pursuant to § 8 of the act of Congress of July 22, 1854, establishing the office of surveyor general of New Mexico, &c., reported the grant to Congress for confirmation as "a good and valid grant according to the laws and customs of the Government of the Republic of Mexico and the decisions of the Supreme Court of the United States, as well as the treaty of Guadalupe-Hidalgo." The grant was accordingly confirmed, as recommended by the surveyor general, June 21, 1860, 12 Stat. 71.

In 1869, having previously become the proprietor of the grant, Maxwell applied to the land department for its survey, claiming that it comprised about 2,000,000 acres lying partly in Colorado, but mainly in New Mexico. The matter of the survey was in due course taken to the Secretary of the Interior, and on the 31st of December, 1869, Secretary Cox decided that the confirmed grant was limited to two tracts of eleven square leagues each. In 1871, the Maxwell Land-Grant and Railway Company, having meantime become the owner of the grant, renewed the application for a survey and patent under the claim as put forth by Maxwell in 1869: this application was refused by Secretary Delano upon the ground that the decision of Secretary Cox was final as to the extent of the grant so far as the Executive Departments were concerned. In March, 1877, the Maxwell Land-Grant and Railway Company made another application for a patent upon the claim of locality and extent as theretofore. A survey was

ordered and executed the same year, and the patent issued under the survey May 19, 1879.

These were the facts as claimed by the United States, and in this court their counsel maintained that the decree dismissing the bill was erroneous in the following respects:

"*First.* The grant of the Republic of Mexico could not under Mexican laws, exceed altogether twenty-two square leagues, equivalent to 97,424.8 acres of land, to be found within the outboundaries designated,

"*Second.* The report of the surveyor-general of September 17, 1857, recommended the grant for confirmation for no greater quantity of land than twenty-two square leagues.

"*Third.* The confirmatory act of June 21, 1860, did not operate as a grant *de novo* for the land in excess of twenty-two square leagues.

"*Fourth.* The survey under which the patent issued and the patent itself, included, in addition to the twenty-two square leagues, many hundred thousand acres *within* the outboundaries designated in the grant proceedings, not included in the grant as confirmed, and also several hundred thousand acres (about 400,000) lying upon the outside of the eastern and northern outboundaries, also not included in the confirmed grant.

"*Fifth.* The patent was issued by the officers of the Land Department to include the lands *within* the outboundaries set down in the grant proceedings, in excess of twenty-two square leagues, inadvertently and by mistake caused by ignorance of the law and of their authority in the premises, and to include the lands *outside* the outboundaries, inadvertently and by mistake produced by the frauds and deceits practised upon the Commissioner of the General Land Office by the owners of the grant and their agents, and by Surveyor General Spencer, and the deputy United States surveyors, Elkins and Marmon, in the interest of such owners.

*Mr. Assistant Attorney General Maury* for appellant.

The grant to Beaubien and Miranda is a Mexican grant and not a United States grant. Since the change of sovereignty:

it has never been treated as anything but a Mexican grant, pure and simple.

The surveyor general who passed upon it under the eighth section of the act of July 22, 1854, in his report recommending the confirmation of the grant, commends it to Congress as " a good and valid grant *according to the laws and customs of the Government of the Republic of Mexico and the decisions of the Supreme Court of the United States* as well as the treaty of Guadalupe-Hidalgo of February 2, 1848, and is therefore confirmed to Charles Beaubien and Guadalupe Miranda, and is transmitted for the action of Congress in the premises." And Congress, in passing on this grant by the act approved June 21, 1860, expressly confirms the same *" as recommended for confirmation by the surveyor general"* of New Mexico.

Being a Mexican grant in the beginning, and subject to the laws and customs of Mexico, it is for this court to determine whether there exists any authorized process of evolution, by which this original Mexican grant of twenty-two square leagues to Beaubien and Miranda could have grown and expanded into the princely domain covered by the patent. Certainly there is nothing in the treaty of Guadalupe-Hidalgo that warrants the exaggeration which has been given to this grant, for the treaty merely provides for the protection of persons and property in the ceded territory, which, indeed, is no more than is guaranteed by the law of nations in such cases. That there is nothing in the laws of Mexico or the United States that justifies the exaggeration complained of, we shall now proceed to show.

One of the earliest things done by the government of Mexico after throwing off the Spanish yoke, was to adopt the decree or law of the 18th of August, 1824, for the colonization of the public domain, and the regulations of 1828, authorized by that decree or law, for carrying it into effect. It cannot be denied, without ignoring the repeated decisions of this court, that the grant to Beaubien and Miranda was subject to the decree and regulations just mentioned, and, consequently, that it, in common with all grants of the public

domain of Mexico, not made to *empresarios* or contractors stipulating to introduce and colonize many families on the land granted as a consideration for the grant, was, when made, subject to the limitation imposed by the 12th article of the decree or law of the 18th of August, 1824, which is in these words: " It shall not be permitted to unite, in the same hands, with the right of property, more than one league square of land, suitable for irrigation, four square leagues in superficies, of arable land, without the facilities of irrigation, and six square leagues in superficies, of grazing land," making in all eleven square leagues as the maximum quantity that could be covered by a grant to any one person not an *empresario*. In *Van Reynegan* v. *Bolton*, 95 U. S. 33, which was an action of ejectment, based on a title derived from Mexico, the court says: " The grant is not set forth in the record; but we must presume that it was in the ordinary form of grants made by former governors of California, under the Mexican coloniza- tion law of 1824, *as under no other law were those governors empowered to make grants of the public domain.*" In *United States* v. *Vigil*, 13 Wall. 449–451, this court says: "*It has been repeatedly decided by this court, that the only laws in force in the territories of Mexico for the disposition of the public lands, with the exceptions of those relating to missions and towns, are the act of the Mexican Congress of 1824 and the regulations of 1828.*" The same doctrine is laid down or recognized in the following cases: *Fremont* v. *United States*, 17 How. 542; *United States* v. *Cambuston*, 20 How. 59; *United States* v. *Workman*, 1 Wall. 745; *United States* v. *Jones*, 1 Wall. 766; *United States* v. *Hartnell*, 22 How. 286; *United States* v. *D'Aguirre*, 1 Wall. 311; *United States* v. *Pico*, 5 Wall. 536; *United States* v. *Vigil*, 13 Wall. 449; *Colorado County* v. *Com- missioners*, 95 U. S. 259; *United States* v. *Valejo*, 1 Black, 541; *Hornsby* v. *United States*, 10 Wall. 224.

Turning now to the petition of Beaubien and Miranda asking for the grant, we find that, after indulging in cer- tain general observations about the physical and moral de- velopment and improvement of the particular region wherein they desired to seat the solicited grant, they say: " Under the

above conviction we both request your excellency to be pleased to grant us a tract of land for the purpose of improving it, without injury to any third party, and raising sugar beets, which we believe will grow well and produce an abundant crop, and in time to establish manufactories of cotton and wool and raising stock of every description." They then go on to describe the locality of the solicited grant by reference to natural objects.

It is thus perfectly obvious, that this grant is one of the ordinary Mexican grants to colonists, and is marked by no feature to distinguish it in principle from the grants passed upon by this court in the cases above referred to or to take it out of the operation of the 12th article of the colonization act of 1824. The conclusion, then, is inevitable, that at the time of the conquest and cession it was not possible for Beaubien and Miranda to lay claim to more than eleven square leagues each, according to the land measure adopted by this court in the *United States* v. *Perot*, 98 U. S. 428, 430.

If, then, the grant has expanded to the gigantic proportions of the patent, it must have been because the United States has not only confirmed the grant as made by Mexico, but has enlarged it with a prodigal hand. It becomes necessary, then, to inquire whether anything has been done by the United State since the conquest and cession to warrant the contention that the grant has been enlarged as well as confirmed.

To remove all doubt as to land titles in New Mexico, claimed to be founded on Spanish or Mexican grants, Congress, by an act approved the 22d July, 1854, provided (§ 1) for the appointment of a surveyor general for that territory, and further provided (§ 8): That it shall be the duty of the surveyor general, under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character, and extent of all claims to lands *under the laws, usages, and customs of Spain and Mexico;* and for this pur- pose may issue notices, summon witnesses, administer oaths, and do and perform all other necessary acts in the premises. *He* shall make a full report *on all such claims as originated before the cession of the territory to the United States by the*

*treaty of Guadalupe-Hidalgo, of eighteen hundred and forty-eight,* denoting the various grades of titles, with his decision as to the validity or invalidity of each of the same *under the laws, usages, and customs of the country before its cession to the United States.* . . . Such report to be made according to the form which may be prescribed by the Secretary of the Interior; which report shall be laid before Congress for such action thereon as may be deemed just and proper, *with a view to confirm bona fid. grants, and give full effect to the treaty of eighteen hundred and forty-eight, between the United States and Mexico.*

If anything is plain, it is that Congress intended to respect only such claims to land as should be valid "*under the laws, usages, and customs of Spain and Mexico;*" and that the power of the surveyor general to make inquisition into land titles should be limited to those "laws, usages, and customs," and that it should be his duty to report to Congress, through the Secretary of the Interior, his decisions as to the validity or invalidity of such titles, according to those "laws, usages, and customs." It is equally clear that Congress reserved to itself a revisory jurisdiction over the decisions of the surveyor general for "such action thereon as may be deemed just and proper, *with a view to confirm bona fide grants and give full effect to the treaty of eighteen hundred and forty-eight, between the United States and Mexico.*"

Congress having therefore limited its appellate function to the confirmation or rejection of grants, good or invalid, according to the "*laws, usages, and customs of the country,*" and protected by the treaty of Guadalupe-Hidalgo, it may be safely said to be impossible to understand that Congress, in confirming a claim reported valid by the surveyor general, could have meant to do more than confirm the same as it existed at the time of the cession under "the laws, usages, and customs" then in force, it being to be conclusively presumed, in every case of this description, that Congress acted within the limitations imposed on itself by the 8th section of the act of 1854 (*supra*), and no language used by it, while avowedly exercising its revisory power over the decisions of the surveyor

general, can be held to import an intention to augment as well as confirm a Spanish or Mexican grant unless so explicit as to *compel* that sense. This brings us to a consideration of the proceedings, after the cession, looking to the confirmation of the grant to Beaubien and Miranda.

On the 23d of February, 1857, the claimants filed their petition in the office of the surveyor general, asking the confirmation of their grant. On the 17th of September, 1857, the surveyor general decided that the grant was "good and valid" "*according to the laws and usages of the Government of the Republic of Mexico and the decisions of the Supreme Court of the United States as well as the treaty of Guadalupe-Hidalgo, of February 2, 1848,*" and confirmed the same to the grantees. This report was transmitted to the Secretary of the Interior with a letter dated 12th January, 1858.

These proceedings deserve attention in more than one particular. It will be observed that the petitioners, Beaubien and Miranda, state, in presenting their case, "*that said tract has never been surveyed, and they cannot, therefore, furnish any certain estimate of its contents.*" Plainly, then, the surveyor general had no *data* before him from which he could form an idea of the area embraced by the outboundaries given in the petition, and which were those established by the alcalde in delivering judicial possession. It is obvious, then, that the surveyor general, in confirming this grant as good and valid according to the laws and usages of Mexico and the decisions of this court, cannot be understood as sanctioning the grant to a greater extent than eleven leagues apiece to each of the grantees, which is all they could claim under the laws, usages, and decisions referred to and relied upon by the surveyor general. The decisions of this court, to which he refers, are undoubtedly those in the cases of *Arguello* v. *United States*, 18 How. 539; *United States* v. *Reading*, 18 How. 11, decided in 1855, and *Fremont* v. *United States*, 17 How. 542, decided in 1854. In which cases the Mexican law of 1824 and the regulations of 1828, pursuant thereto, are recognized as governing Mexican grants to colonists, like Beaubien and Miranda, at the time of the cession.

It was upon this presentation that the Beaubien and Miranda grant came before Congress for the action called for by the 8th section of the act of 1854. It was not until 1860 that Congress took the required action. By an act approved the 21st of June, in that year, entitled "An act to confirm certain private land claims in the Territory of New Mexico," this grant, with others was declared to be confirmed "*as recommended for confirmation by the surveyor general of that territory;*" that is to say, Congress confirmed it in so far as it had validity by the laws, usages, and decisions relied on by the surveyor general, who being, as we have seen, ignorant of the area comprehended within the outboundaries given in the petition and accompanying *expediente*, appealed to those laws, usages, and decisions as furnishing the limitations to which the grant was subject.

Now this is the whole foundation on which rests the claim to the principality covered by the patent. That every presumption is against the claim seems obvious. In the first place, Beaubien and Miranda were the beneficiaries of Mexico, and whatever consideration moved from them to Mexico as an inducement to the grant ceased to exist after the cession, when a new and a radically different plan for settling the country, by small homestead donations of one hundred and sixty acres to each grantee, was introduced by the new sovereignty.

Such grants as Beaubien and Miranda claimed were against the policy of the new government — a policy declared and established by the act of 1854 (*supra*), and it would seem improbable in the highest degree that Congress should have intended to go beyond its duty of confirming the grant as authorized at the cession, and to augment it by a vast additional concession, thus placing, with wanton prodigality, in the hands of two foreigners, a vast area that should have been left open to entry by our own people. It is quite safe to say that no Congress would have dared to do an act knowingly, which looked so much like belittling and undervaluing an acquisition for which our people had given their blood and treasure.

As confirmatory of this reasoning, to show the original extent of the grant, we would refer again for a moment to the *expediente*. It seems that proceedings under the original petition by Beaubien and Miranda had been suspended in consequence of certain representations which had been made to the authorities by one Martinez, a priest. In reply to, and refutation of, these representations Charles Beaubien, for himself and Miranda, filed a petition in which he states that the proposed grant to him and Miranda "*does not exceed fifteen or eighteen*" leagues, a declaration of great significance, as having been made at a time when there was no apparent motive for fraudulent exaggeration. And the facts that he locates the lands solicited at the place El Rincon del Rio Colorado, "including the Rayado and Poñil rivers, &c.," and that the governor general refers to the lands as the Rincon del Rio Colorado, coupled with the testimony before the surveyor general in support of the application for confirmation, show that the owners of the grant themselves looked upon the tract of country which could be readily irrigated from the rivers mentioned as the seat of the solicited grant, and nothing is better settled in proceedings of this character than that the grant must not exceed the limit stated in the petition applying for it, which is the foundation on which every step leading to the concession is based.

. But supposing, in view of the array of facts and arguments above presented, that it is not clear that Congress intended to confirm the grant to Beaubien and Miranda and at the same time make them a large grant *de novo*, then the rule is that the doubt must be resolved in favor of the Government, as this court has repeatedly laid down.

In *Leavenworth, &c., Railroad Company* v. *United States*, 92 U. S. 733, 740, the court say: "If rights claimed under the Government be set up against it, they must be so clearly defined that there *can be no question of the purpose of Congress to confer them*. In other words, *what is not given expressly or by necessary implication, is withheld*." In *Slidell* v. *Grand-jean*, 111 U. S. 412, 437, the court say: "It is also a familiar rule of construction, that where a statute operates as a grant

of public property to an individual or the relinquishment of a public interest *and there is a doubt as to the meaning of its terms or as to its general purpose, that construction should be adopted which will support the claim of the Government rather than that of the individual. Nothing can be inferred against the state.*" And in *Dubuque & Pacific Railroad* v. *Litchfield,* 23 How. 66, 88, it is laid down, with reference to a land grant, that "all grants of this description are strictly construed *against* the grantees; *nothing passes but what is conveyed in clear and explicit language.*" And this is the doctrine declared in the great cases of *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, *Providence Bank* v. *Billings,* 4 Pet. 514, and *Jackson* v. *Lamphire,* 3 Pet. 289.

If the question involved were whether the United States had exempted the land in controversy from taxation, and the argument in support of the pretension were no stronger than the argument relied on to sustain the claim to more than twenty-two square leagues of land, the decision would be against the exemption set up, inevitably, for the want of a sufficiently clear indication of purpose to grant it; and yet the two cases are identical in principle, for how can a distinction be drawn between surrendering the power through which the property of Government is obtained, and giving away the property itself? And why should not the presumption in favor of the Government be stronger, if anything, in the case of a pure donation, like the case in hand, than in the case of a contract containing a consideration to support the claimed immunity from taxation?

Now it would seem impossible that the candid inquirer would be able to find in this case anything to *compel* the conclusion that Congress intended to withdraw from entry by our own people an immense area of valuable land not covered by any grant, *merely for the aggrandizement of two foreigners who had no claims whatever on the United States* further than to be protected in their persons and property.

In arriving at the intention of Congress in the confirmatory act of the 21st June, 1860 (*supra*), it is important to keep in mind that the great majority of grants made by Mexico that

have come under judicial or congressional review since the cession were made without any previous survey whatever, and with no other guide as to locality than such references to conspicuous natural objects as occurred to the unlettered pioneers as sufficient to indicate the particular parts of the country out of which they wished the grants solicited by them to be carved when surveys could be made.

The observations of Mr. Justice Miller in *Rodrigues* v. *United States*, 1 Wall. 582, 587, 588, descriptive of Mexican grants in California, are equally true of grants by the same authority in New Mexico. He says: "Some idea of the difficulties which surround these cases may be obtained by recurring to the loose and indefinite manner in which the Mexican government made the grants which we are now required judicially to locate. That government attached no value to the land, and granted it in what to us appears magnificent quantities. Leagues instead of acres were their units of measurement, and when an application was made to the government for a grant, which was always a gratuity, the only question was whether the locality asked for was vacant and was public property. When the grant was made, no surveyor sighted a compass or stretched a chain. Indeed, these instruments were probably not to be had in that region.

"A sketch called a diseno, which was rather a map than a plat of the land, was prepared by the applicant. It gave, in a rude and imperfect manner, the shape and general outline of the land desired, with some of the more prominent natural objects noted on it, and a reference to the adjoining tracts owned by individuals, if there were any, or to such other objects as were supposed to constitute the boundaries. Their ideas of the relation of the points of the compass to the objects on the map were very inaccurate; and as these sketches were made by uneducated herdsmen of cattle, it is easy to imagine how imperfect they were. Yet they are now often the most satisfactory and sometimes the only evidence by which to locate these claims." Observations of substantially the same character were made by the House Committee on Private Land Claims, with reference to land claims in New Mexico, communicated to Con-

gress for confirmation,· in their· report recommending the·
passage of the bill which soon became the act of 21st June,
1860.

Knowing then, as Congress did undoubtedly, that there was
no way of ascertaining the areas of a majority of these grants .
without surveys, and that the rude descriptions usually ac-
companying applications to the Mexican authorities for grants
of land did not pretend to be more than indications of the par-
ticular regions where the applicants desired their grants to be
located,· it seems in the highest degree unreasonable to say
that Congress, by· confirming such grants, intended that the·
confirmation should be commensurate with these exaggerated
and proverbially inaccurate descriptions.  Congress knew it
could work no prejudice to the public good to confirm these
grants as reported, because what they lacked in definiteness
of description was supplied by the Mexican law forbidding
more than eleven square leagues to come into the hands of
any one person, not an *empresario*.   Congress was well
aware that, when the necessary surveys were made, by gov-
ernment authority, all uncertainty would be rendered certain,
and that all lands in excess of what could be lawfully held
would at once fall into the public domain and be thrown open
to entry by our own people.  The Supreme Court in Fre-
mont's case, and other cases, had settled the validity of grants
of this description, and seeing that great delays had already
occurred through the nonaction of Congress, and that uncer-
tainty about titles in New Mexico was extremely unfavorable
to the settlement and development of the country, Congress
determined, as was its duty under the treaty of peace and
cession, to confirm these grants in their then condition, with-
out waiting for surveys.

Now the position taken by the Government is met by the
defendant, the Maxwell Land-Grant Company, not so much
by an attempt to refute the reasoning by which that position
is supported as by an appeal to the decision of this court in
the case of *Tameling* v. *United States Freehold Company*, 93
U. S. 644.   That case involved a portion of the *Sangre de
Cristo* grant, which was confirmed by the same· act of Con-

gress as confirmed the Beaubien and Miranda grant, and as
the *Sangre de Cristo* grant had its own peculiar and distin-
guishing facts, it is apparent that before the case relied on can
be held to control the case at bar, it must be shown that the
two grants as reported to Congress were alike in every mate-
rial particular, for it will be observed that the decision in the
Tameling case turns upon the intention of Congress in confirm-
ing the grant " *as recommended for confirmation by the sur-
veyor general,*" words of qualification which are applied by
Congress to all the grants confirmed at the same time, and,
therefore, the terms of recommendation, used by the surveyor
general, with reference to each grant confirmed, formed as
much a part of the law as if they had been recited in it.

The grant in the Tameling case belonged to the same de-
scription of grants as the grant now in question, and was at the
time of the conquest and cession governed by the law of 1824,
and, we have no doubt, would have been confined within the
limit of that law as to quantity but for the extraordinary way
in which the surveyor general recommended it to Congress for
confirmation.   Referring to the act of judicial possession, the
surveyor general says, " the justice of the peace, José Miguel
Sanchez, placed the parties in possession of the land, *with the
boundaries contained in the petition, vesting in them, their chil-
dren and successors, a title in fee to said lands.*" He then
goes on, with remarkable ignorance of the subject and the
decisions of this court, and attributes the most extraordinary
powers over the public lands to the Mexican departmental
governors.   He says: " The supreme authorities of the remote
province of New Spain, afterwards the Republic of Mexico,
exercised from time immemorial certain prerogatives and
powers, which, although not positively sanctioned by Congres-
sional enactments, were universally conceded by the Spanish
and Mexican governments; and there being no evidence that
these prerogatives and powers were revoked or repealed by
the supreme authorities, it is to be presumed that the exercise
of them was lawful.   The subordinate authorities of the prov-
inces implicitly obeyed these orders of the governors, which
were continued for so long a period until they became the uni-

versal custom, or unwritten law of the land wherein they did not conflict with any subsequent Congressional enactment. Such is the principle sanctioned by the Supreme Court of the United States, as expressed in the case of *Fremont* v. *The United States*, 17 How. 542, which decision now governs all cases of a similar nature." He then concludes by declaring "*that a legal title vests in Charles Beaubien to the land embraced within the limits contained in the petition.*"

Now, it would seem reasonable that the confirmation of the *Sangre de Cristo* grant "*as recommended*" should have been held to carry the title to the whole tract, the confirmatory law operating as a patent, and, like a patent, being open to correction in a direct proceeding for that purpose. To be sure it would have been more satisfactory, perhaps, if the court had said more, with a view to repelling the idea that the language used in the act of confirmation was not strong enough to *compel* the conclusion that Congress, without any apparent reason, had determined to depart from the line of proceeding it had chalked out for itself in the act of 1854 (*supra*) merely for the purpose of aggrandizing a foreigner at the expense of our own people.

That Congress was misled by the surveyor general's statement that the Sangre de Cristo grantee had both seisin and title up to the outboundaries given in the petition would seem clear from its action upon the Scolley claim, and upon the Vigil and St. Vrain claim, which latter being discovered to be for a quantity of land largely in excess of what was allowed by the law of 1824, was cut down to the maximum permitted by that law, notwithstanding the surveyor general's repetition in that case of the gross errors of law contained in his Sangre de Cristo report about the powers of Mexican governors, which Congress, with a full knowledge of the decisions of this court, seems to have treated as unworthy of notice.

Turning now to the report of the surveyor general on the Beaubien and Miranda claim, we find his recommendation to Congress essentially different from that made by him in his Sangre de Cristo report. In place of giving boundaries and deciding that the claimants had seisin and title clean up to those bound-

aries, he does as he should have done in the Sangre de Cristo
and like cases recommended by him, that is to say, he decides
that the grant is good and valid "*according to the laws and
customs of the Government of the Republic of Mexico and the
decisions of the Supreme Court of the United States, as well
as the treaty of Guadalupe-Hidalgo of February* 2, 1848, *and
is therefore confirmed to Charles Beaubien and Guadalupe
Miranda, and is transmitted for the action of Congress in the
premises.*" It is *as thus recommended* that the Beaubien and
Miranda grant was confirmed by Congress, and if there is any
similarity between the confirmation thus made and the con-
firmation in the Tameling case, we have failed to discover it.
But, after all, the decision in the Tameling case ends with
that case, as it is hardly probable that another case just like
it will arise again.

To show how inadequate was the consideration given by
Congress to these Mexican claims, and that in disposing of
almost every case from New Mexico Congress was content to
follow the lead of the surveyor general, who was no lawyer,
we refer again to the succinct report of the House Committee
on Private Land Claims, made at the 1st session of the 36th
Congress, already referred to more than once; and we respect-
fully submit that these considerations with reference to the
way in which Congress passed on Mexican land claims should
be allowed to have great weight with the court in construing
the confirmatory act of 1860.

If the above reasoning is sound, it follows inevitably that
the patent in question is void because embracing a large
extent of country which the Executive Department had no
power to dispose of in that way. This court has again and
again held that the defence of purchaser *bona fide* is no
answer to a bill filed to cancel a patent for want of authority
in the land office to issue it, and that, like the judgment of a
court proceeding without jurisdiction, it can be assailed on
that ground whenever and wherever relied on. It is unneces-
sary to cite authority on a point so well established.

Whether, then, the excess in the patent be determined by
the limit of the Mexican law of 1824, or by the outboundaries

named in the original petition for the grant, the action of the land office as to such excess was unauthorized, and the patent, being an entirety, thereby rendered void *in toto.* But in the case at bar, as has been fully shown by the brief of the United States special attorney [*post*], we have, in addition to want of authority, instances of fraud and misrepresentation, used for the purpose of enlarging the outboundaries of the grant to Beaubien and Miranda, of which the defendant, the Maxwell Land-Grant Company, had notice, as we contend.

It was intimated in the court below by the counsel for the defendant that the grant to Beaubien and Miranda was an *empresario,* but this was manifestly a mere afterthought, for there is not a syllable in the record to countenance any such idea. From the beginning the grant has been treated by the parties interested as an ordinary grant to individuals for their own use. To make the grant valid as an *empresario* the approval of the supreme government was necessary, but the approval obtained was that of the departmental assembly, which was only sufficient to perfect the ordinary colonization grant.

In the protracted and earnest discussion of this claim before the Department of the Interior, it was not hinted that the grant was an *empresario,* so far as the record shows; an omission which is inexplicable if it had been supposed there was a pretext for advancing such a claim. Evidently the court below attached no importance to the point, for it does not notice it in its opinion.

In conclusion we would call attention to the point made in the brief of the special counsel [*post*], that there was no jurisdiction in the land office to order the Elkins and Marmon survey, the decision of Mr. Secretary Cox, on this very grant, that *it must be restricted to twenty-two square leagues,* being then in full force.

It is respectfully submitted that the decree should be reversed.

*Mr. J. A. Bentley,* special counsel for the United States, in addition to arguing the points maintained by *Mr. Maury,* contended as follows:

*The outboundaries.* The eastern and northern lines of the patented lands lie several miles outside of the corresponding outboundary lines of the confirmed grant and include several hundred thousand acres of the public domain outside the true outboundaries of the grant on the east and north, which the land officers had no authority, for the purpose of the grant, to include in the patent.

(1) The outboundary lines specified by Surveyor General Pelham in his report of the grant for confirmation are to be followed in locating the outboundary lines upon the ground. After what was said by this court in the *Tameling Case,* as to the office and force of the report of the surveyor general, argument of counsel will be powerless to shake the proposition that the confirmed report has all the force of law; it was incorporated into the act of confirmation for the purposes of the grant, to settle its object, its locality, and its extent.

After distinguishing the plan adopted by Congress for the investigation of the Mexican grants in California by procedure essentially judicial in character, from that adopted for the New Mexico grants by the political branch of the government, through inquiries by the surveyor general, reserving final action to Congress, the court say: "Such action (the final action by Congress confirming the grant) is of course conclusive, and therefore not subject to review in this or any other forum. It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor general or his decision declaring the validity of the grant." The description, therefore, recited by the surveyor general to identify the grant petition, he having referred to no other description by which the grant was to be located, is the governing description in the location of the outboundary lines upon the ground, and will prevail over the description of the alcalde in the act of possession if they are found to disagree with each other.

The conflict, however, which the Commissioner of the General Land Office supposed existed, but did not describe, between the description in surveyor general Pelham's report

and that of the alcalde's certificate of possession, does not in fact exist. The description adopted by the surveyor general is substantially the same as that employed by Beaubien and Miranda in petitioning for the grant. A comparison of the descriptions of the petition for the grant, of the alcalde's juridical possession certificate, and of the surveyor general's report will set at rest the question of conflict.

In order to test, if not to contradict the official translation of the description in the petition for the grant, the defendant called Rafael Romero, an expert in the translation of the Mexican-Spanish into English. From a comparison of all these documents it is seen that the outboundaries of the grant as described in the petition are substantially the same as the description in the surveyor general's report, and both are in agreement with the translation produced by the defendant's expert, Romero; while the alcalde's certificate in terms adopts the description in the petition with the plat as correct, and certifies that the two are in conformity with each other and with the certificate, as to the identity of the land referred to. There can be, therefore, no conflict between the description of the outboundaries of the grant as given by the surveyor general, by Beaubien and Miranda in their petition for the grant, and by the alcalde in his certificate of the act of possession. All that can be said is, that the alcalde adopted the natural object boundary calls of the petition, but added some artificial calls consisting of stone mounds in entire consistency with the natural objects.

The eastern outboundary line of the grant as designated by the alcalde, and as designated by the surveyor general, is, then, tied to the natural objects mentioned in the petition for the grant, and the same is also true in respect to the northern outboundary line, that is to say, the eastern line commencing below the junction of the Raydo (now Cimarron) with Red River at the first hills east of Red River, follows northerly along the first hills east of and along Red River to opposite the junction with Red River of a stream called Una de Gato River, flowing south out of the table-lands which constitute the northern boundary, and continuing, follows the first hills

east of the Una de Gato to the summit of the table-land, and the northern line follows along said summit northwesterly to the top of the mountain which divides the waters of the rivers running to the east from those running towards the west.

The plat of the alcalde purports to lay down the relative positions, upon the ground, of the natural objects in the out-boundary lines of the grant, and the places of his stone mounds in relation to these natural objects, and of the principal streams of water within these lines, including the Colorado River and its affluents, the Rayado and its affluents, and the Vermijo. The Colorado is represented as making a bend, forming an angle a little greater than a right angle, at the junction of the Una de Gato, and as having a general course below the said junction through the grant, not less than 15 degrees east of south. The Una de Gato is represented as a stream flowing south out of the table-land and emptying into the Colorado at the upper end of the bend. The table-land is represented as commencing on the west near to the Sierra Madre and falling off a little to the south of east, extending beyond the head of the Una de Gato, and named upon the plat as "table-land of the Chicorica or Chacuaco," and the first hills east of the Colorado and the Una de Gato are shown as a continuous line from the southeast to the northeast corner of the grant, following along the course of the two streams in an unbroken northerly direction to the table-land.

The natural objects upon the western and southern out-boundaries are as specifically marked upon the plat, but the recital of their detail is not necessary for the purpose of this argument.

The alcalde's certificate states that in the execution of the act of possession he *erected seven* mounds on the outbounda-ries of the grant. Mound No. 1 on the east side the Red (Colorado) River. Mound No. 2 in an easterly direction in the first hills east of the river. Mound No. 3 on the north side of the Chicorica or Chacuaco table-land. Mound No. 4 on the summit of the mountain. Mound No. 5 on the Cuesta del Osha, 100 varas north of the road from Fernandez to

Laguna Negra. Mound No. 6 on the eastern point of the Gonzalitos table-lands and Mound No. 7 on the west side of the Red (Colorado) River opposite to the first mound. The plat certified to be correct by the alcalde, as before shown, shows that the relative positions of all these mounds, but particularly of the first four, correspond with the natural objects described in the report of the surveyor general, and shows that the third mound was placed upon the table-land near the head and to the east of the Una de Gato in a line with the first hills east of the Colorado. extended northerly along the first hills east of the Una de Gato, and the fourth mound on the Sierra Madre in a line with the general course of the table-lands called by the alcalde Chicorica, or Chacuaco.

If the plat can be depended upon as a generally correct outline of the country it purports to represent, explained by the petition for the grant and the alcalde's certificate, there ought to be little difficulty in locating upon the ground, the eastern and northern outboundaries of the grant as confirmed.

The government insists that the plat is a correct general outline of the country. The defendant denies that it is so, and claims that it is radically incorrect in the representation of the Una de Gato River and in the location of the third mound, asserting that the Una de Gato River referred to by the alcalde is a stream having its source some eighteen miles almost directly east of the bend in the Colorado, and forming a junction with that river more than eight miles below the bend, and that the alcalde's third mound was erected upon the northwest point of what is now known as San Francisco mesa, twelve miles to the northwest of the head of the stream claimed by the defendant as the Una de Gato.

The government contends, on the other hand, that the stream now called Dillon's Cañon is the Una de Gato of Beaubien and Miranda and of the alcalde, and necessarily also of Surveyor General Pelham; that the Raton Mountains, dividing the waters flowing into the Colorado from those flowing into the Las Animas is the table-land forming the northern boundary of the grant; and that the third mound was erected on said table-land at the head of the Una de

Gato (now Dillon's Cañon), and east rather than northwest of the stream.    Nearly the whole of the oral testimony and much of the documentary evidence bears pro or con upon these opposing claims, and the establishment of the government's contention upon this question will necessarily be fatal to the defendants' case.

(2) *Raton Mountain Mesa.*   The summit of Raton Mountains, extending from the Sierra Madre in a general course a little south of east to the Raton pass, is the "table-land" of Surveyor General Pelham's report, and also of the "Chicorica or Chacuaco" of the alcalde's certificate; and the stream, in nature flowing down from the Raton Mountains and forming a junction with the Colorado or Red River, at the bend, now known as Dillon's Cañon, is the Una de Gato of the alcalde, as well as of Surveyor General Pelham.

While the word "mesa" employed in the proceedings of Mexico to describe the contour of the earth's surface along the northern outboundary of the grant and translated into English "table-land," suggests to the American uplifted flat lands having precipitous edges like the formation to the east of Raton pass, it is the term used by the Mexicans to denote flat lands at the top of hills and mountains without regard to whether the edges are precipitous or sloping.

The summit of Raton Mountains west of Raton pass to the Sierra Madre is "mesa" within the significance of that term as used by the Mexicans.

There is no ground, except the summit of Raton Mountains south of the Arkansas River, the contour of which answers to that designated by the Mexican authorities and by Surveyor General Pelham as the northern line of the grant, *i.e.*, which presents a "mesa" or table-land formation from which the drainage flows south into Red River *above the bend*, and extending out to the eastward from the Sierra Madre far enough to cover the river until it turns to the south.

The defendants maintain that, notwithstanding the correspondence of the topography of the Raton Mountains with the ground called for along the northern outboundary, and notwithstanding the fact that there cannot be found any other

ground which will answer the call for that line, still, the mountains west of Raton pass are not the ground intended by the authorities of Mexico as the northern outboundary of the grant, because that locality is not known as "Chicorica or Chacuaco mesa," and there is a Chicorica mesa east of the pass where defendants claims the alcalde erected the third mound.

Appellant says in response, that the alcalde's description of the eastern and northern lines of the grant has been shown to be essentially identical with the description in the petition for the grant and the plat, and also with the description contained 'in the surveyor general's report. The alcalde has simply applied the name of "Chicorica or Chacuaco mesa" to the table-land along the north line, which is not given a name either by the petitioners for the grant or by the surveyor general. The alcalde's certificate of possession declares, "*We proceeded to erect the mounds according as the land is described in the accompanying petition, and which corresponds with the plat to which I attach my rubric.*"

Two years before the alcalde set up the mounds, the petitioners for the grant identified the north line by describing the contour of the earth along where it ran, making reference to no local name to aid identification. This would have scarcely occurred if a distinguishing name generally known had at that time been associated with the place.

The form of expression used by the alcalde, "Chicorica or Chacuaco mesa," indicates that the alcalde was uncertain which, if either, name belonged to the place he had in mind, or that the two names were applied to the place interchangeably. These words have not the same significance, and, except their use by the alcalde in the plat and certificate of possession, and their employment by Griffin upon his fraudulent plat of 1870, to simulate the alcalde's application of the names, I think no instance can be found where the words have been used in a manner to leave room for inference, even, that they were, or might properly be applied to the same place.

It will be borne in mind that at the time of the grant proceedings, and for several years later, the country in question

was not inhabited by civilized men. Jones says that as late as 1846, 1847, and 1848, it was inhabited by "Indians, wild horses and buffalo;" and Silva says that when he first became acquainted with the country there were no civilized people from the Sierra Madre to Bent's Fort on the Arkansas.

The limited vocabulary of the Indians, and the necessarily imperfect understanding of the Indian languages by the early hunters, travellers and traders, together with the gradual application of names to localities and objects in nature which before had been unnamed or included in some general Indian name not fully understood, incident to the occupation of the country by the Mexicans and Americans, will largely, if not altogether, account for the uncertainty and inconsistencies apparent in the testimony of the witnesses who testify at this late day in regard to the names in the country in question, and suggest an explanation of how the alcalde came to apply the names Chicorica or Chacuaco to the table-land west of the Raton pass. A brief analysis of the testimony of some of the more important of these witnesses upon this point will show the situation with sufficient clearness.

It shows that there was a country in the Raton Mountains including some, if not all the high mesas east and southeast of Raton pass, to which the Indians previous to their migration applied the name Chicorica; that those most familiar with the Indians did not gather from them the same idea of its locality and extent, and it may very well be supposed that the alcalde living at Taos thought the names Chicorica and Chacuaco were properly applicable to the whole Raton range of table-lands whether east or west of Raton pass.

*The Una de Gato River.* The claim that the branch of the Chicorica, running out from the south side of San Isedro and Una de Gato mesas, is the Una de Gato of the grant, rests upon the evidence showing that from a date several years later than the grant down to the present time, that stream has been called Una de Gato, and the testimony of witnesses Silva and Wooton that they knew it by that name before the grant.

It has already been noted that the country was occupied by Indians until several years subsequent to the grant. Now, Una de Gato is the name given by the Mexicans to the black locust, on account of the resemblance of its thorns to cat's claws, and it is alleged it was applied to *this* stream because the locusts grew along its banks; but it cannot be assumed that because Silva, Wooton, and perhaps other hunters were familiar with this insignificant stream before the occupation of the country by the Mexican people and called it Una de Gato its existence was known to the people of Taos or other Mexican towns. If it had been a large stream, an important object in nature, or upon a route of travel, that presumption might perhaps have been indulged, but it was neither; it is simply one of the branches of a larger stream lying entirely out of the way of the routes of travel in the days of the grant. Nor does the fact that the petitioners for the grant and the alcalde mentioned a Una de Gato River as one of the natural objects of description argue very strongly for the defendants' Una de Gato when it is remembered that the black locust abounds on all the mountain streams in that country.

Besides this, the neighborhood furnishes several examples of two or more streams and places called by the same name. There is the Trinchera, a branch of the Las Animas and also a branch of the Rio Grande; the Ute, a branch of the Red, also of the Cimarron and of the Sangre de Cristo; the Willow, a branch of the Cimarron and of the Chicorica. There are also two branches of the Las Animas called San Francisco, and two towns within the Vigil and St. Vrain grant called La Junta. Nor will the circumstance that the name of the stream claimed by the government as the Una de Gato is now known by another name add to the strength of the defendants' claim. Ahogadere mesa has become San Francisco, and the lower waters of the Rayado have now become the Cimarron.

But space need not be consumed in illustrating how the alcalde may have applied the name Una de Gato to what is now Dillon's Cañon, nor how that name may have given place to the name by which it is now known. History is full of

accounts of the process of displacement of savage races by civilization, showing the gradual change of name, one for another, to designate objects in nature, and the application of names to places before unnamed as settlement progressed and the particular knowledge of the geography of the country advanced. This is certain, the name Una de Gato was not applied to the stream by the Indians, but by Mexicans, and therefore it may be assumed to be a name of comparatively late date, and as we hope to satisfy the court that neither Silva nor Wooton, whose testimony alone dates the name of this stream as Una de Gato earlier than the grant, are to be believed in any point in support of the defendants' claim unless they are themselves corroborated by reliable witnesses, we say without hesitation that the testimony does not name the stream Una de Gato until several years later than the grant, 1848 or 1849, when Jones testifies that he knew it by that name; or possibly it might be inferred from Bransford's testimony that the name had been given it as early as 1846.

The Una de Gato Creek does not answer the description of the Una de Gato of the grant. It does not form a junction with Red River, but is simply a branch of the more important stream, Chicorica, emptying into the latter four and a half miles above the junction with the Red, which stream joins the Red more than nine miles below the bend, where the Una de Gato of the grant is represented by the alcalde to form a junction with it; and besides it comes into the Chicorica from an easterly direction, and not from the northerly, as the course of the Una de Gato is represented by the alcalde. The claim of the defendants that Una de Gato Creek is the Una de Gato of the grant is as absurd a geographical proposition as the declaration that the Platte, a tributary of the Missouri at Omaha, or the Tennessee, a tributary of the Ohio at Paducah, are tributaries of the Mississippi at St. Louis and Cairo, respectively, would be.

Elkins and Marmon's field notes in their 36th, 37th and 39th mile on east line, show that the Chicorica stream is a considerable stream, carrying "plenty of fine water." It is impossible to believe that the alcalde in delineating this grant

upon the plat called the Chicorica below the junction of the Una. de Gato, a mere branch, by the name of the branch. Such a designation would have been the introduction into the geography of the grant, of a rule of nomenclature of streams wholly at variance with the universal usage of mankind, in their designation by name — that of absorbing the branches into the principal streams at their junction.

The presumption of the general correctness of the alcalde's plat in delineating the territory of the grant, and the natural objects referred to by him in their relation to each other, cannot, owing to its official and solemn character, be overcome by slight or uncertain evidence in respect to the *names* of objects otherwise described; and if objects in nature are found in general correspondence to the plat, they will be adopted as the objects referred to by him in disregard of the names which he may have applied to them, unless other objects in nature bearing the names used, are found which equally well answer his description. *Names* used to designate objects in nature, introduced into descriptions of lands, give way to descriptions of localities by contour of the ground intended, if the same are definite enough to secure identification without reference to the names. If the names used are inconsistent with the rest of the description, or tend to make uncertain what otherwise would be certain, they will be treated as surplusage.

Outside of the presumption of the general correctness of the plat in its delineation of the ground, it carries evidence on its face that it truthfully shows the relations, one to another, of the principal natural objects laid down upon it as far as they were known to the alcalde.

Recurring again to the fact that the country, down to the date of the grant and several years later, was unoccupied by civilized inhabitants, but occupied by the Indians alone, except upon the routes of travel, it may now be added that along such routes, the country was more or less known to the civilized people of the neighborhood and to travellers. Besides the prominent features of the land, like the Sierra Madre and Raton Ranges and isolated mountains like Eagle Tail,

which could be seen from a distance, the topography was quite particularly known along the travelled route from Bent's Fort on the Arkansas towards Santa Fé and Taos, over Raton pass, via Stockton (Clifton) crossing of Red River and Rayado, and along the old Fort Leavenworth route, crossing Red River at Rocky Ford below the junction of the Rayado (Cimarron).

Comparatively correct information may therefore be attributed to both the petitioners for the grant and the alcalde in respect to the topography in the immediate vicinity of those routes of travel, and they may be supposed to have known the general course of Red River at these crossings, and also of the drainage courses from the Raton divide in the neighborhood of the route over Raton pass; while neither can be presumed, at that day, to have had any particular knowledge of the geography and topography of the country at any considerable distance away from either route.

What do we find upon the plat?

(1) That the general course of Red River in the immediate vicinity of the crossings is correctly laid down from northwesterly to southeasterly, while the variable courses of the river, as it exists in nature, between the crossings for a distance of thirty miles, about which no particular knowledge is supposable, is incorrectly assumed to be the same as at the crossings.

(2) That the great bend in the river a mile or more above the Stockton crossing, in near proximity to which the Raton route lay, is correctly set down.

(3) That a drainage stream from the Raton divide having its course from the divide southward and emptying into the river at the bend; along which that route follows for more than two miles above the junction, and from there to the top of the divide, a distance of seven miles, passes along a little to the east of it, is correctly delineated and named by the alcalde Rio del Una de Gato.

(4) That the watercourses of the grant on the Raton route from Stockton crossing to the Rayado are laid down with their names as then known with comparative exactness.

(5) That the mesa Rayado and Gonzalitos on the southern

boundary, in view from both the Raton and Leavenworth routes, are represented with comparative truth.

(6) That the headwaters of the Rio Fernandez, embracing the southwest corner of the grant as in nature, are correctly laid down.

(7) That three prominent peaks in the Sierra Madre, on the western boundary, to wit, Boundary peak, Costilla and Baldy, or perhaps Taos peaks, are correctly noted at the headwaters of the streams of the grant shown on the plat, although unnamed by the alcalde.

(8) That the foot-hills along the Sierra Madre and Raton ranges are delineated by properly waved lines with a comparatively proper trend as they exist in nature, as is also the line of the first hills east of Red River to the summit of Raton divide.

(9) That the northern line of the grant, upon the top of the watershed from which the waters flow south into Red River above the bend, is correctly noted by proper lines denoting the watercourses from the northern boundary to the Red River.

It is true, that some of these objects, perhaps most of them, are to some extent out of place as they exist in nature, as might be expected would be the case with a plat drawn without scale and without actual measurement under a compass and chain, but their relations to each other as laid down are so truthful to nature that their identification cannot well be mistaken, and show beyond a doubt that it was faithfully drawn to represent as truthfully as might be what was matter of knowledge as well as what was matter of estimation and judgment. So truthful, indeed, that the principal error in the course of Red River between the crossings on the Raton and Leavenworth routes, resulting in a plat showing the bend in Red River to be a considerable distance to the westward of the Leavenworth crossing, when in nature it is almost directly to the north of it, and the course of the river between the crossings the same as at the crossings, shows that in making his plat the alcalde faithfully adhered to the knowledge he possessed and filled up the intervening spaces upon his judg-

ment, informed by that knowledge, and adds to, rather than detracts from the authority of the plat whenever it represents objects which were known at the time.

Inasmuch, therefore, as the stream now called Dillon's Cañon — a name evidently later than the grant proceedings — and from its location near the route of travel over Raton pass, between the Arkansas and Taos and other settlements in New Mexico, presumably known to the alcalde, corresponds in the place of its source, its course to and place of junction with Red River, with the stream marked upon the alcalde's plat and named by him Rio del Una de Gato, and neither the Una de Gato Creek, now claimed by the defendants, nor any other stream in the country, does so correspond, Dillon's Cañon, whether rightfully or wrongfully named Una de Gato by the alcalde and by whatever name it may have since been known, is the Una de Gato of the grant.

But other circumstances confirm this conclusion. According to the plat the third mound of the alcalde was erected upon the summit of the divide between the waters flowing south into Red River above the bend, in a line parallel with the general course of Red River below the bend extended, and near the head of the stream named by him Una de Gato, but on the *east* side of it. If Una de Gato Creek now claimed, be assumed as the Una de Gato of the grant, the place of the third mound as claimed by the defendants is more than six miles north, and more than seven miles west of the extreme headwaters of the Una de Gato and entirely out of correspondence with the representations of the alcalde's plat and of his certificate of possession.

Another matter of great significance is, in that country the water fall is so light that the lands are incapable of producing crops without artificial irrigation, and when inaccessible to the streams of water, of little value for grazing purposes; therefore, the natural water courses were regarded as of the utmost importance to the enjoyment of the lands, and a principal feature everywhere. It will be observed that the plat is drawn to exclude from the eastern outboundaries of the grant all lands east of Red River watered by streams

which flow into it south of the bend, and to *include* the lands watered by the streams flowing into it from the west, above the Leavenworth crossing, and from the south slope of the divide drained by the river above the bend. Now, the Chicorica is a considerable stream, and with its various branches waters a large tract of country immediately adjacent to the Raton route and joins Red River a few miles below Stockton crossing. Owing to its command of a large tract of country in plain view of the Raton route, and the fact that it also lay in the route of the Indian traders, buffalo hunters, and travellers from Stockton crossing via Manca de la Burra pass to the plains beyond, its existence and location must have been known to the petitioners for the grant and to the alcalde, and if it had been intended to include those lands within the out-boundaries of the grant, the purpose would have been indicated by incorporating the stream into the plat.

It is certain that the particularity and correctness of detail just pointed out, which characterizes the plat, would not have omitted to note the Chicorica with equal correctness, as a tributary of Red River, joining it on the *east* and below the bend, so as to carry the land embraced by its waters, if that had been the intention of the petitioners and of the alcalde.

*Third Mound.* The third mound was not erected by the alcalde upon the northwest extremity of San Francisco mesa. For the purposes of this case the alcalde's certificate of possession, reciting his proceedings and the date and order thereof, is conclusive upon the defendant and the government alike. The statement that he commenced on the east of Red River and erected a mound, and went to the first hills east of the river and erected another mound, and proceeded thence from south to north on a line nearly parallel with Red River and erected a third mound, &c.; and the seventh and last mound on the west side of Red River opposite the first, all which was done between the 13th day of February, 1843, when the alcalde recorded his decree to proceed to put the petitioners in possession, and the 22d of the same month, the date of the certificate *is verity, and not the subject of contra-*

*diction,* for the reason that the certificate was incorporated into the report of the surveyor general, and thence into the act of Congress confirming the grant.

The claim that the third mound was erected on the northwestern extremity of San Francisco mesa rests wholly upon the testimony of the witnesses Silva and Wooton that they saw the alcalde place a mound there, and that the fourth mound was erected on a certain high peak of the Sierra Madre, sixteen miles to the north of the 37th parallel, upon the testimony of Silva alone.

A careful analysis of their testimony shows that these witnesses are unworthy of belief, and the position of the government that the plat of the alcalde sets down his stone mounds and the natural object of the outboundaries in their true positions as related to each other, stands unshaken.

The claim of the government that the northern outboundary line of the grant is along the top of the Raton Mountains, is supported by the nearly contemporaneous grant made to Cornelio Vigil and Ceran St. Vrain, popularly known as the Las Animas grant, the southern boundary of which is upon the northern boundary of the grant in question. An examination of the plat, although a very rude one, and far from correct as the ground is now known, and containing errors, which, without particular knowledge of the topography, tend to mislead, shows clearly enough that the southern boundary was intended to correspond with the northern boundary of the Beaubien and Miranda grant, and to be upon a divide from which the waters flow northward into the Arkansas, and that it was intended to include within the boundaries of the grant, the lands embraced by the waters of the Las Animas, Huerfaro, and Apishapa rivers.

*Mr. Bentley* also argued at some length that frauds were practised upon the government, by means of which "the patent was made to include several hundred thousand acres outside the true boundaries on the east and north," herein discussing the maps in the case; also that the decision of Secretary Cox in December, 1869, was so far final as to debar

subordinates from subsequently reopening it; and, further, that the defendant was not a *bona fide* purchaser for value after issue of the patent. It is not practicable to report his contentions on these points as fully as his arguments on the other points above reported.

*Mr. Frank Springer* and *Mr. Charles E. Gast* for appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

The case was an appeal from the Circuit Court of the United States for the District of Colorado.

The decree from which this appeal is taken dismissed a bill brought in that court by the United States against the Maxwell Land-Grant Company, the Denver and Rio Grande Railway Company, the Pueblo and Arkansas Valley Railroad Company, and the Atchison, Topeka and Santa Fé Railroad Company. It was brought by the Attorney General of the United States, and its purpose was to have a decree setting aside and declaring void a patent from the United States granting to Charles Beaubien and Guadalupe Miranda, their heirs and assigns, a tract of land described in a very extensive survey, which is made a part of the patent. It is stated in the brief of the Assistant Attorney General in this court that the patent conveys 1,714,764$\frac{94}{100}$ acres of land, lying partly in the territory of New Mexico and partly in the state of Colorado. This patent is dated May 19, 1879, and seems to be regular on its face in every particular. The bill to set this patent aside was filed in the Colorado Circuit Court on August 25, 1882, which was a little over three years after the patent was issued. By virtue of certain mesne conveyances, and other transactions not necessary to be recited here, it may be stated that the title conveyed by the patent to Beaubien and Miranda enured immediately upon its being issued to the benefit of the Maxwell Land-Grant Company, a corporation which has the beneficial interest in the grant, so far as appears in this record, and the contest is mainly if not exclusively between the United States and that company.

The original bill filed in the case assailed the grant mainly upon the ground that the patent was issued by the Executive Department of the government upon the false representations of the defendant, the Maxwell Land-Grant Company, and those whose estate the company has in the land, and of whose fraudulent actings and doings in the premises the company had notice at the time it acquired the title. This bill recites the original grant of January 10, 1841, by the Republic of Mexico, which it declares was in due form of law, made to Beaubien and Miranda, citizens of said republic, and it gives the description of the land and its boundaries which is here the subject of controversy. The bill also declares that said grant and the proceedings had in regard thereto were in due form of law and in accordance with the usages and customs of that country, as more fully appeared by reference to the grant and act of possession, copies of which were annexed thereto, and that it was duly accepted by the grantees, who immediately thereupon entered into possession of the premises, and that they, and those holding under them, have ever since been in the quiet, peaceable and exclusive possession thereof.

The bill then declares that the Surveyor General of the territory of New Mexico, under the act of 1854, made a report in favor of this grant; that on June 21, 1860, the Congress of the United States confirmed and ratified it as recommended; and that the patent was afterwards issued upon a survey made by order of the government under the instructions of the Surveyor General of New Mexico, approved by the Commissioner of the General Land Office, which patent is made an exhibit to the bill. This original bill then goes on to charge that the survey on which this patent was issued was falsely and fraudulently made, and that the Maxwell Land-Grant Company, and certain parties who made this survey under a contract with the government, conspired to cheat and defraud the government of the United States by including a larger amount of land than was intended to be embraced by the original grant of the Republic of Mexico; and it especially charged that about 265,000 acres, to wit,

all the lands lying and being in the county of Las Animas, in the state of Colorado, were fraudulently included in this survey, and were of the value of two millions of dollars. The main purpose of the bill, and the only specific prayer for relief, is, that the survey may be declared void so far as it includes lands within the state of Colorado, though it concludes by praying for general relief.

It is quite obvious that the ground of relief set out in this bill is that the excess of 265,000 acres lying within the present state of Colorado was included within the survey by fraud, and that this fraud should be remedied. · No attempt is made in the bill to assail the remainder of the grant or to point out any reason why the patent should not be good for all the lands in New Mexico. After answers had been filed to this bill, and a large amount of testimony taken, there was filed, on the 5th day of December, 1883, an amended bill, which it is now insisted is substituted for the original bill. In this amended bill, for the first time, it is set up, as a ground for setting aside the patent and survey on which it was made, and having them declared void, that under the laws of Mexico at the time it was made, no such grant could exceed eleven square leagues to each individual, and that by virtue of those laws, therefore, the grant to Beaubien and Miranda could not exceed twenty-two leagues, the equivalent of which is 97,424 acres. The bill then sets out with something more of particularity the errors supposed to exist in the survey on which the patent from the United States was based, and the frauds connected with that survey by which the officers of the government were imposed upon and induced to issue the patent. Much of the testimony, and perhaps most of it, was taken before this amendment was filed, and it is strongly insisted in the brief of the appellees, that the reason for filing it was that the testimony taken in regard to the frauds, and in regard to the mistake of the officer of the government in running the boundaries of the grant, had failed to establish such fraud and mistake.

Answers and replications were filed in due time, and a large amount of testimony taken, which, with the pleadings,

documents and proceedings of the court, and other public bodies, constitute a printed record of nearly nine hundred pages.

The questions which are presented by this record and which demand our consideration may be divided into three:

First. Do the colonization laws of Mexico, in force at the time the grant was made to Beaubien and Miranda, namely, the decree of the Mexican Congress of August 18, 1824, and the general rules and regulations for the colonization of the territories of the Republic of Mexico of November 21, 1828, render this grant void, notwithstanding its confirmation by the Congress of the United States?

Second. If the grant be valid, is there such a mistake in the survey on which the patent of the United States was issued as justifies the court in setting aside both patent and survey?

Third. Was there such actual fraud in procuring this survey to be made and the patent to be issued upon it as requires that the patent be set aside and annulled?

As regards the first of these propositions, it is undoubtedly true that the decree of the Mexican Congress of 1824, in regard to grants of the public lands, declared, by Article 12, that "it shall not be permitted to unite, in the same hands, with the right of property, more than one league square of land suitable for irrigation, four square leagues in superficies of arable land without the facilities of irrigation, and six square leagues in superficies of grazing land."

It has been repeatedly decided by this court that it was the practice of the government of Mexico, under that article, to limit its grants of public lands in the territories to eleven square leagues for each individual.

But Article 14 of the same decree speaks of "the contracts which the *empresarios* make with the families which they bring, at their own expense, provided they are not contrary to the laws;" and Article 7 of the Rules and Regulations of 1828 speaks of "grants made to *empresarios*, for them to colonize with many families." It is a well known matter of Mexican history, that, by reason of there being vast quantities of unoccupied and unprofitable public land owned by the government

in its territories, contracts were made with individuals called *empresarios*, by which they were given very large bodies of land without any regard at all to the eleven league limitation, in consideration that they should bring emigrants into the country and settle them upon these lands with a view of increasing the population and securing the protection thus afforded against the wild Indian tribes on the Mexican borders.

There are many things in the history of this grant to Beaubien and Miranda which would seem to indicate that it was understood by the Mexican authorities to be a grant of the class just described.

In the petition of Beaubien and Miranda to Governor Armijo, on which the grant was founded, dated January 8, 1841, there is a very animated description of the condition of the Territory of New Mexico and its natural advantages, which were undeveloped for want of an industrious population. It also contains a description of the land, by its boundaries, which was granted by the governor in compliance with this petition, and as this description and its true construction is the foundation of the controversy in this suit with regard to the accuracy of the surveys, it is given here:

" The tract of land we petition for to be divided equally between us commences below the junction of the Rayado River with the Colorado, and in a direct line towards the east to the first hills, and from there running parallel with said river Colorado in a northerly direction to opposite the point of the Una de Gato, following the same river along the same hills to continue to the east of said Una de Gato River to the summit of the table-land (mesa); from whence turning northwest, to follow along said summit until it reaches the top of the mountain which divides the waters of the rivers running towards the east from those running towards the west, and from thence following the line of said mountain in a southwardly direction until it intersects the first hills south of the Rayado River, and following the summit of said hills towards the east to the place of beginning."

The authoritative grant of Governor Armijo, dated three days later, is in the following language:

"SANTA FÉ, *January* 11, 1841.

" In view of the request of the petitioners, and what they state therein being apparent, this government, in conformity with law, has seen proper to grant and donate to the individuals subscribed the land therein expressed, in order that they may make the proper use of it which the law allows.

" ARMIJO."

Looking to this question of the nature of the grant, as to whether it was an ordinary grant, it appears by the record that Beaubien made application in April, 1844, to the governor of the Department, stating that a curate named Martinez was seeking to invade and dispute the rights of the said Beaubien and Miranda in a part of the lands included in their grant. In this petition, remonstrating against a recognition of the claim of Martinez which had been made by the Territorial government, he says:

" And not only does the suspension of labor on those lands injure us, for the reason of having incurred heavy expenses, but also a considerable number of families and industrious men, who are willing and ready to settle upon those lands, and to whom we have given lands, a list of which individuals I accompany in order that your excellency, seeing their number, may determine what may be proper."

This shows that the grantees were engaged in settling families within the boundaries of their grant.

This matter was referred to the Departmental Assembly, who made a report upon the subject, confirming the grant of the governor to Beaubien and Miranda, and deciding against the claim of Martinez and his associates. The Assembly in making their report upon this subject declare the statements by which Martinez and his associates had obtained certain privileges within the boundaries of the grant to have been false, and proceed as follows: " And in view of the documents which accredit the legitimate possession of Miranda and Beaubien, and their desires that their colony shall increase in prosperity and industry, for which purpose he has presented a long list of persons to whom they have offered land for culti-

vation, and who shall enjoy the same rights as the owners of the lands; that the government, having dictated the step for the sole object of ascertaining the truth, that the truth having been ascertained, and the right of the party established, is of the opinion that the aforesaid superior decree be declared null and void, and that Miranda and Beaubien be protected in their property, as having been asked for and obtained according to law."

To this the governor ordered the response to be made, that, in accordance with the opinion of the Departmental Assembly, thus certified to him, "the order of the 27th of February, issued by this government, forbidding the free use of the land in question, is repealed, and Messrs. Beaubien and Miranda are fully authorized to establish their colony according to the offers made by them when they petitioned for the land which has been granted to them."

It would seem from these orders, decrees, and resolutions of the governor and Departmental Assembly of the Territory of New Mexico, that they must have supposed that the grant was intended for families to be settled upon, and was not one of those in which an individual could only receive a definite quantity of land for the purpose of his own settlement and cultivation. There would have been little cause for the frequent use of the words "colony" and "colonization" and such expressions as "settling families" in the colony, unless such was the view which the granting power took of the nature of the grant.

The effect of the action of the Departmental Assembly in regard to these grants of land within the territories over which they had jurisdiction is one which has been frequently considered in this court, and the importance of their action fully stated. *Hornsby et al.* v. *United States,* 10 Wall. 224; *United States* v. *Osio,* 23 How. 273.

The final confirmation of this grant by the Congress of the United States in 1860 affords strong ground to believe that that body viewed it as one of this character, and not one governed by the limitation of eleven square leagues to each grantee. The act by which that was done was approved

June 21, 1860, and is entitled "An act to confirm certain pri-vate land claims in the Territory of New Mexico." 12 Stat. 71. These claims, having been reported favorably to Congress for confirmation by the surveyor general of the Territory of New Mexico, were numbered in consecutive order, and referred to in that act by their numbers. The one now under consideration was number fifteen. The first section of that act reads as follows:

"That the private land claims in the Territory of New Mexico, as recommended for confirmation by the surveyor general of that territory, and in his letter to the Commissioner of the General Land Office, of the twelfth of January, eighteen hundred and fifty-eight, designated as numbers one, three, four, six, eight, nine, ten, twelve, fourteen, fifteen, sixteen, seventeen, and eighteen, and the claim of E. W. Eaton, not entered on the corrected list of numbers, but standing on the original docket and abstract returns of the surveyor general as number sixteen, be, and they are hereby, confirmed: *Pro-vided,* That the claim number nine, in the name of John Scolley and others, shall not be confirmed for more than five square leagues; and that the claim number seventeen, in the name of Cornelio Vigil and Ceran St. Vrain, shall not be confirmed for more than eleven square leagues to each of said claimants."

It will be very clearly perceived by the proviso of this act that the attention of the framers of the statute was turned to the law of Mexico which limited the ordinary grant of land to each individual to eleven square leagues; for, in regard to claim number seventeen, it was expressly provided that it should not be confirmed for more than eleven square leagues to each of the claimants. As the claim of Beaubien and Miranda was like that of Vigil and St. Vrain in number seventeen, a grant to two persons, it must be obvious that the attention of the framers of the act was called to the fact, that, in the one instance, however large the claim might be, it should only be confirmed, for eleven square leagues to each grantee, according to the law of 1824, while in regard to the other, in a like grant to two persons, which the surveyor gen-

eral and the Commissioner of the General Land Office, as well as the Congress of the United States, must have known included many times eleven square leagues, they made no such restriction.

The second section of the act of 1860 declares: "That in surveying the claim of said John Scolley it shall be lawful for him to locate the five square leagues confirmed to him in a square body in any part of the tract of twenty-five square leagues claimed by him; and that in surveying the claims of said Cornelio Vigil and Ceran St. Vrain the location shall be made as follows, namely: The survey shall first be made of all tracts occupied by actual settlers, holding possession under titles or promises to settle, which have heretofore been given by said Vigil and St. Vrain, in the tracts claimed by them, and after deducting the area of all such tracts from the area embraced in twenty-two square leagues, the remainder shall be located in two equal tracts, each of square form, in any part of the tract claimed by the said Vigil and St. Vrain selected by them; and it shall be the duty of the surveyor general of New Mexico immediately to proceed to make the surveys and locations authorized and required by the terms of this section."

The fair inference from all this is, that Congress, in passing this statute, considered some of the grants as being of the character to which the limitation applied, and did not so consider others, though they included immense areas.

But whether, as a matter of fact, this was a grant, not limited in quantity, by the Mexican decree of 1824, or whether it was a grant which in strict law would have been held by the Mexican government, if it had continued in the ownership of the property, to have been subject to that limitation, it is not necessary to decide at this time. By the treaty of Guadalupe Hidalgo, under which the United States acquired the right of property in all the public lands of that portion of New Mexico which was ceded to this country, it became its right, it had the authority, and it engaged itself by that treaty to confirm valid Mexican grants. If, therefore, the great surplus which it is claimed was conveyed by its patent to Beau-

bien and Miranda was the property of the United States, and Congress, acting in its sovereign capacity upon the question of the validity of the grant, chose to treat it as valid for the boundaries given to it by the Mexican governor, it is not for the judicial department of this government to controvert their power to do so. *Tameling* v. *United States Freehold Co.*, 93 U. S. 644.

This case of Tameling, while it cannot be said to be conclusive of the one now before us, for the reason that that was an action of ejectment founded upon a title confirmed by an act of Congress, in which the title could not be collaterally assailed for fraud or mistake, and the present is a suit attacking the patent and the survey upon which it issued directly by a bill in chancery to set them aside for such fraud and mistake, still the opinion announces principles which, as applicable to this case and as regards the question of the extent of the grant, it would seem should govern it. The title in that case was confirmed to Tameling's predecessor in interest by the same act which confirmed the grant now in question to Beaubien and Miranda, the one being number fourteen and the other number fifteen, as enumerated in the section of the statute already recited. In regard to that statute, and its effect upon the title confirmed by it, this court (p. 662) says: "No jurisdiction over such claims in New Mexico was conferred upon the courts; but the surveyor general, in the exercise of the authority with which he was invested, decides them in the first instance. The final action on each claim reserved to Congress is, of course, conclusive, and therefore not subject to review in this or any other forum. It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor general, or his decision declaring the validity of the grant. They are embodied in his report, which was laid before Congress for its consideration and action. . . . Congress acted upon the claim 'as recommended for confirmation by the surveyor general.' The confirmation being absolute and unconditional, without any limitation as to quantity, we must regard it as effectual and operative for the entire tract. The plaintiff in error insists

that, under the Mexican colonization laws in force when the grant was made, not more than eleven square leagues for each petitioner could be lawfully granted. As there were in the present instance but two petitioners, and the land within the boundaries in question is largely in excess of that quantity, the invalidity of the grant has been earnestly and elaborately pressed upon our attention. This was a matter for the consideration of Congress; and we deem ourselves concluded by the action of that body. The phraseology of the confirmatory act is, in our opinion, explicit and unequivocal."

It will be seen that the same question was raised in that case, as in this, in regard to the effect of the decree of the Mexican Congress of 1824 in limiting the extent of the grant, which by its boundaries very largely exceeded the quantity which the two petitioners in that case, as in this, would be entitled to. The cases were numbers fourteen and fifteen out of a series of eighteen or twenty. They were confirmed by the same section of the same statute and were in immediate contiguity in the context. In both there were two claimants under the same grant, who would have been entitled, under the decree of 1824, if applicable to the case, to twenty-two square leagues, that is, to eleven square leagues each. They were recommended for confirmation by the same surveyor general who had investigated the titles and who was authorized by the statute which created his office to pass upon the extent as well as the validity of the grants. The question was, therefore, in the Tameling case precisely the same as in the present, and it is not perceived how the questions of reforming the grant by a direct proceeding in chancery, and giving a construction to it in an action of ejectment, can be decided upon any different principles. If the Mexican government had no power to grant anything beyond twenty-two square leagues in either case, the excess of the grant beyond that was void. This objection could as well be taken in an action of ejectment, where no particular twenty-two leagues had been set apart out of the much larger grant covered by the boundaries, as it could by a bill in chancery to set aside or correct the patent. The principles of law applicable to the

issue are the same in both cases, and the declaration of the court in the Tameling case, that this was matter for the consideration of Congress, and it deemed itself concluded by the action of that body, is as applicable to the present case as it was to that.

The argument is here much pressed that the power of the surveyor general of New Mexico, in investigating and reporting upon these Mexican grants, was limited to ascertaining the validity of the claim as a grant by the Mexican government, and not to its extent, and that the act of Congress confirming the report of that officer and confirming the grant was not intended to be conclusive in regard to the boundaries or the quantity. But § 8 of the act of July 22, 1854, 10 Stat. 308, under which the report of the surveyor general was made in regard to these claims, directs him to ascertain the *extent*, as well as other elements of the claims to be referred to him. The language of that section is as follows:

" That it shall be the duty of the surveyor general, under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character and *extent* of all claims to lands under the laws, usages and customs of Spain and Mexico, and for this purpose [he] may issue notices, summon witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages and customs of the country before its cession to the United States."

In the present case the surveyor general had before him, not only the original grant of Armijo to Beaubien and Miranda, but he had the record of the juridical possession delivered to the grantees, according to the laws of Mexico on that subject, made by the justice of the peace, Cornelio Vigil, accompanied by a map or diseño[1] laying down with at least

---

[1] This diseño will be found on page 370.

attempted particularity and precision the complete boundaries of this tract of land. So that the surveyor general not only had the authority to determine the extent of the grant, as well as its validity, but he had the means of ascertaining it. Upon what argument, therefore, it can be held that the surveyor general, with this entire matter before him, and with the means of ascertaining or describing with precision the extent of the grant to these parties, should be held not to have passed upon it, but simply upon the validity of the original transaction with Armijo, is not readily to be perceived. The surveyor general was not certainly of the class of officers to whom would have been confided by law the mere question of the legal validity of a grant made by a Mexican governor to a Mexican citizen. Others could do that as well as he when the facts were laid before them. But as his office was a surveying office, and was designed to ascertain the location and the extent of grants by an examination of the maps and surveys; and making new surveys if necessary, a function preeminently appurtenant to his office, he must be supposed to have reported upon all that was proper for consideration in its confirmation. And when the Congress of the United States, after a full investigation, and elaborate reports by its committees, confirmed these grants "as recommended for confirmation by the surveyor general" of the territory, we must suppose that it was intended to be a full and complete confirmation, as regards the legal validity, fairness and honesty of the grant, as well as its extent. This is made the more emphatic by the two or three cases, in which the extent and location of the grant are specially limited in the very act of confirmation, included in the same section and the same sentence.

It is observable that, in the argument of the counsel for the United States in this case, the boundaries of this tract of land are constantly spoken of as outboundaries, within which a smaller quantity of land may be located, as the real grant in this case. This phrase, "outboundary," has its proper use in regard to certain classes of Mexican grants, but it is wholly inapplicable and misleading as referring to the one now under

Opinion of the Court.

1. Sketch from the Diseño of the Beaubien and Miranda Grant, extended on the lines of United States surveys.

Opinion of the Court.

COLORADO

NEW MEXICO

T. 26 N.

T. 25 N.

R. 18 E.
T. 24 N.

R. 19 E.

R. 20 E.

Boundaries of the Beaubien and Miranda Grant, as surveyed and patented.

consideration. There were grants made by officers of the Mexican government which were limited in quantity by the terms of the grant, and which the grantee might locate at any place he chose inside of a much larger quantity of land the limits of which were correctly described as "outboundaries." In such cases the use of the term, as describing the larger and greater tract within which the smaller and more limited quantity might be selected by the grantee, had its just and well-understood meaning. Grants of that class were quite numerous, and sometimes half a dozen grants to different individuals would be made within the same outboundaries, and occasionally there are cases where these smaller portions must include a dwelling or some improvement held by the grantee at the time. The whole of this subject is very well considered and explained by Justice Field in the opinion of this court in the case of *Hornsby* v. *United States*, 10 Wall. 224. He says: "As we have had occasion to observe in several instances," [referring to *Higueras* v. *United States*, 5 Wall. 828; *Alviso* v. *United States*, 8 Wall. 339,] "grants of the public domain of Mexico, made by governors of the Department of California were of three kinds: 1st, grants by specific boundaries, where the donee was entitled to the entire tract described; 2d, grants by quantity, as of one or more leagues situated at some designated place, or within a larger tract described by outboundaries, where the donee was entitled out of the general tract only to the quantity specified; and 3d, grants of places by name, where the donee was entitled to the tract named according to the limits, as shown by its settlement and possession, or other competent evidence."

It is entirely clear that the grant to Beaubien and Miranda was a grant of the first class, a grant by specific boundaries, where the donee was entitled to the entire tract described. There is nothing in the language of the grant, nor in the petition, nor in anything connected with it, nor in the act of juridical possession, to indicate that either Governor Armijo or Beaubien and Miranda, or the officer who delivered the juridical possession to them, had any idea or conception that the grantees were not to have all the land within the bounda-

ries established by that juridical possession. Hence the idea of counsel that there were only twenty-two square leagues, or 97,424.8 acres, granted within this great boundary is entirely unsupported, the case not being one of a grant of a more limited quantity within a larger outboundary. While the argument, whether sound or unsound, that the grant could only be upheld for the twenty-two square leagues, may be pressed now against the validity of the grant in excess of that amount, there was evidently no such thought in the minds of the parties when it was made.

It is not inappropriate here to allude to an argument suggested, but not much pressed, by counsel, that, in the petition of Beaubien against the intrusion of the priest Martinez, he speaks of his own grant as being only about fifteen leagues. We think a critical examination of that petition will show that he is speaking of the claim of Martinez and his associates as amounting in all to about fifteen leagues, and not of his own claim under the grant.

We are, therefore, of opinion that the extent of this grant, as confirmed by Congress, is not limited to the twenty-two square leagues, according to the argument of counsel, and that the act of Congress makes valid the title under the patent of the United States, unless proved to be otherwise, by reason of error or mistake in the survey, or fraud in its procurement.

As regards the survey on which the patent was issued, and which is made a part of the patent, under the seal of the United States and the signature of the President, it is to be observed that the evidence shows that the General Land Office made every effort to have it accurate. The survey was made by authority of the commissioner of that office, under the supervision of the Surveyor General of New Mexico. A survey had been previously made by W. W. Griffin, who was employed by the claimants to make it, because the then 'Secretary of the Interior had declined to order a survey. This survey was completed during the year 1870, and though purely a private enterprise and unofficial, the plat and field notes were deposited in the General Land Office by the claim-

ant, presumably for the information of the government as to the exact location of the exterior lines as claimed by the owners of the grant. The Land Office having afterwards, under the influence of the decision of the Supreme Court in *Tameling* v. *United States Freehold Co.*, determined that it was its duty to ascertain the extent of this grant and to issue a patent for it, was about issuing orders to the Surveyor General of New Mexico to have this grant surveyed, when it was suggested by the claimants that the commissioner should adopt the survey of Griffin, above referred to. He, however, declined to pursue this course; first, because he did not think it was a proper procedure; and second, because he did not think that the eastern and northern boundaries had been correctly located by the Griffin survey. The Surveyor General thereupon made a contract for the work with Elkins and Marmon, and the Commissioner of the General Land Office, in approving this contract, gave his own directions as to how these boundaries should be located, and furnished for the guidance of the surveyors an explanatory diagram. This survey was made in the autumn of 1877. The map [1] or plat of it is a part of the record, together with the proofs taken by the surveyors to establish the calls of the grant. Contests were initiated before the Surveyor General upon the validity of this survey by parties who were interested against it, and the case was fully heard on testimony, which testimony was filed with the Commissioner of the General Land Office. He finally approved the survey, and the patent was issued in accordance with it on May 19, 1879.

It is attempted in argument here to point out many errors and mistakes as objections to the accuracy of this survey. There is no reason to doubt that the Surveyor General and the officers employed by him, and the Commissioner of the General Land Office, all of whom gave particular attention to this survey, were well informed on the subject. They knew that it was an immense tract of land, that it would be the subject of grave criticism, and they knew more about it and were better capable of forming a judgment of the correctness of that sur-

[1] See page 371.

vey than this court can be. We may add, that, after all the research, industry, and ability of special counsel for the government, when the testimony taken in the case to prove these errors, and the record of the juridical possession, have been considered with the best judgment that we can bring to them, we are not satisfied that the survey is in any essential particular incorrect; but, on the whole, we believe that it substantially conforms to the grant originally made by Governor Armijo.

The principal point in dispute to which the argument of counsel has been addressed is, that the part of the land included in this survey, north of the present line, which divides the state of Colorado and the territory of New Mexico, was improperly included within the survey. In other words, it is argued that this northern line of the survey should have been run from the east to the west upon the summits of the Raton mountains. This range of hills, rather than mountains, seems to project itself as a spur from the great range running north and south which divides the waters that flow east from those which flow west. Running almost due east as you ascended along the foot of this range of hills, on their south side, is the stream called the Colorado River, which seems to spring from the great mountain range before mentioned. The language descriptive of the land in the petition of Beaubien and Miranda, which was granted and donated to them by Governor Armijo, as "therein expressed," is as follows:

"The tract of land we petition for to be divided equally between us commences below the junction of the Rayado River with the Colorado, and in a direct line towards the east to the first hills," [about which there does not seem to be much difficulty,] "and from there running parallel with said River Colorado, in a northerly direction to opposite the point of the Una de Gato, following the same river along the same hills to continue to the east of said Una de Gato River to the summit of the table-land (mesa), from whence, turning northwest, to follow along said summit until it reaches the top of the mountain which divides the waters of the rivers running towards the east from those running towards the west, and from thence following the line of said mountain in a southwardly direction

until it intersects the first hills south of the Rayado River, and following the summit of said hills towards the east to the place of beginning."

Now, it is this northeastern corner whence the course turns to the northwest which is the great subject of controversy, the line following the summit of the mesa, or table-land, to the summit of the mountain. This part of the Colorado River is a natural object which could not be mistaken, and which it is now claimed is the true course of the line, except that it is asserted that it should have followed the summit of the Raton mountains, which are just north of it, and running parallel with the river. That range is also a natural object, easily ascertained, and it would seem but reasonable that one or the other of those objects should have been selected by the grantor as descriptive of the place where this northern line should be located. Instead of this, however, it is said to run to the "summit of the table-land, from whence turning northwest, to follow along said summit," [which evidently means the summit of the table-land,] "until it reaches the top of the mountain." The longest line of the survey is from the southeast corner, in a northerly direction, parallel with the Colorado River; and if the line now contended for by appellant was the true east and west line, it need only have been stated in the grant that it should follow the course of that river to its origin, in the same mountain, which separates the waters of the rivers running cast and west. But instead of speaking either of that river in its course from west to east, or of the Raton mountains, as the natural object which constituted the northerly boundary of the grant, it requires the boundary line to leave the Colorado River at the junction of the Una de Gato River with it, and continuing along a range of hills "to the east of the Una de Gato River to the summit of the table-land." This is not only a strong indication that the northern boundary was not where it is claimed to be by counsel for appellant, but that it was somewhere else; that it was not a range of hills nor a river already mentioned in the grant, but that it was something else called the "summit of the tableland," north of both of these. And although there

is some contrariety of opinion about this "summit of the table-land" which is to constitute the northeastern corner of the grant, we are of opinion, upon a consideration of all the evidence before us, that the survey was located as nearly in accordance with the terms of the grant as it is possible now to ascertain them.

Without going into this evidence more minutely, we are content to say that, while in favor of the correctness of this survey, in the points assailed, it is as strong or stronger than that for any other survey which could be made, or which has been suggested by the counsel for the United States, we are very clear that it is not the province of this court to set aside and declare null and void these surveys and patents approved by the officers of the government whose duty it was to consider them, and who evidently did consider them with great attention, upon the mere possibility or a bare probability that some other survey would more accurately represent the terms of the grant.

The question of fraud in the location of this survey, which is about all the allegation there is of actual fraud in the title of the defendants, is not deserving of much consideration. We are compelled to say that we do not see any satisfactory evidence of an attempt to commit a fraud, and still less of its consummation. As to the principal officers of the government who were connected with that survey, to wit, the Commissioner of the General Land Office and the Surveyor General of the territory of New Mexico, there is not the slightest evidence that they were governed by any fraudulent or improper motive in their acts in regard to this survey, or that they displayed any leaning towards the grantees in ascertaining the true boundaries of the grant. Nor is there any serious attack upon the subordinates of those officers, or any of the persons actually engaged in making the survey, in regard to their honesty of purpose or interest in the result. The principal argument of counsel upon this subject is based upon the Griffin survey, already mentioned, which was deposited by the claimants in the office of the surveyor general of New Mexico. It is argued, in the first place, that this survey was

a very incorrect one, and that it included much more land than was granted by Governor Armijó; secondly, it is insisted that in this respect it was an intentional departure from a correct survey; and thirdly, that it was designed and intended by the claimants to impose this incorrect and fraudulent survey upon the Commissioner of the General Land Office and have him issue a patent for it.

As regards the first element of this allegation of fraud, the incorrectness of the survey and that it included more land than the grant authorized, the only minute and careful survey with which it can be compared is the one upon which the patent finally issued, and we must say, with the light we have upon the subject and the time we have been able to bestow upon its consideration, that it is by no means clear that the Griffin survey, in that respect, is not the most correct one. The defendants here are not in a condition to contest the final survey. It is their business and their duty, having accepted the patent upon it, to defend it. But if it were to their interest, or to anybody's interest, to show that the Griffin survey was the more correct one, it seems to us that arguments in its support would not be wanting.

In the second place, as to any intentional fraud on the part of Griffin or his assistants in the running of these boundary lines, there is not the slightest evidence. And lastly, as to the charge that the Maxwell Land-Grant Company knew this survey to be a false one, and that it included much more land than the company was entitled to, but that they nevertheless endeavored to impose it upon the Commissioner of the General Land Office as a correct survey, there are two emphatic answers: first, there is no evidence that they believed it to be a false survey, and they only asked, or seemed to ask, that this survey might be adopted, because the government had not made, and would not then make, one for itself, in order that they might get the patent to which they were entitled; second, the Commissioner was not imposed upon. If they attempted a fraudulent imposition, they were not successful; he rejected their survey altogether; caused another one to be made, and pointed out in his instructions to those who exe-

cuted the final survey the points of departure from that made by Griffin, upon which he insisted. It seems impossible, in the face of these circumstances, to assume that there was anything in the nature of fraud perpetrated in regard to the Griffin survey and its effect upon the final survey.

The great importance of this case, as regards the immense quantity of land involved and its value, reinforced by the circumstance of the number of cases coming before the courts, in which, under the directions of the Attorney General, attempts are made to set aside the decrees of the courts, the patents issued by the government, and, in this case, an act of Congress, seems to call for some remarks as to the nature of the testimony and other circumstances which will justify a court in granting such relief. The cases of this character which have come to the Supreme Court of the United States have been so few in number that but little has been said in regard to the general principles which should govern their decision. There are decisions enough to guide us in cases where a patent or other title derived directly from the government has been questioned in a collateral proceeding, brought to enforce that title or to assert a defence under it; but the distinction between this class of cases, in which all the presumptions are in favor of the validity of the title, and in regard to which a wise policy has forbidden that they should be thus attacked, and those like the present, in which an action is brought in a court of chancery to vacate, to set aside, or to annul the patent itself, or other evidence of title from the United States, is very obvious. In either case, however, the deliberate action of the tribunals, to which the law commits the determination of all preliminary questions and the control of the processes by which this evidence of title is issued to the grantee, demands that to annul such an instrument and destroy the title claimed under it, the facts on which this action is asked for must be clearly established by evidence entirely satisfactory to the court, and that the case itself must be within the class of causes for which such an instrument may be avoided. *United States* v. *Throckmorton*, 98 U. S. 61.

In the case of *United States* v. *Stone*, 2 Wall. 525, 535, this court said: "A patent is the highest evidence of title, and is conclusive as against the government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. In England this was originally done by *scire facias*, but a bill in chancery is found a more convenient remedy." This was a chancery proceeding to set aside a patent for land.

In the case of *Johnson* v. *Towsley*, 13 Wall. 72, the court, considering the force and effect to be given to the actions of the officers of the Land Department of the government, announces the doctrine that their decision, made within the scope of their authority on questions of this kind, is in general conclusive everywhere, except when reconsidered by way of appeal within that Department; and that as to the facts on which their decision is based, in the absence of fraud or mistake, that decision is conclusive even in courts of justice, when the title afterwards comes in question. But that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and, in cases where it is clear that those officers have by a mistake of the law given to one man the land which on the undisputed facts belongs to another, to give proper relief.

These propositions have been repeatedly reaffirmed in this court. *Moore* v. *Robbins*, 96 U. S. 530; *Marquez* v. *Frisbie*, 101 U. S. 473; *United States* v. *Atherton*, 102 U. S. 372; *Shepley* v. *Cowan*, 91 U. S. 330.

In the case of *The Atlantic Delaine Co.* v. *James*, 94 U. S. 207, Mr. Justice Strong, in delivering the opinion of the court, said, in regard to the power of courts of equity to cancel private contracts between individuals: "Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them." In

Story's Equity Jurisprudence, § 157, it is said that relief will be granted in cases of written instruments only where there is a plain mistake, clearly made out by satisfactory proofs. Chancellor Kent, in the case of *Lyman* v. *United Ins. Co.*, 2 Johns. Ch. 632, which had reference to reforming a policy of insurance, says: "The cases which treat of this head of equity jurisdiction require the mistake to be made out in the most clear and decided manner, and to the entire satisfaction of the court." See also *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 107 Mass. 290.

We take the general doctrine to be, that when in a court of equity it is proposed to set aside, to annul or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which com-

mands respect, and that amount of it which produces conviction, shall make such an attempt successful.

The case before us is much stronger than the ordinary case of an attempt to set aside a patent, or even the judgment of a court, because it demands of us that we shall disregard or annul the deliberate action of the Congress of the United States. The Constitution declares (Article IV, § 1) that "the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory, or other property, belonging to the United States." At the time that Congress passed upon the grant to Beaubien and Miranda, whatever interest there was in the lan· claimed which was not legally or equitably their property was the property of the United States; and Congress having the power to dispose of that property, and having, as we understand it, confirmed this grant, and thereby made such disposition of it, it is not easily to be perceived how the courts of the United States can set aside this action of Congress. Certainly the power of the courts can go no further than to make a construction of what Congress intended to do by the act, which we have already considered, confirming this grant and others.

In regard to the questions concerning the surveys, as to their conformity to the original Mexican grant, and the frauds which are asserted to have had some influence in the making of those surveys, so far from their being established by that satisfactory and conclusive evidence which the rule we have here laid down requires, we are of opinion that if it were an open question, unaffected by the respect due to the official acts of the government upon such a subject, depending upon the bare preponderance of evidence, there is an utter failure to establish either mistake or fraud. For these reasons

*The decree of the Circuit Court is affirmed.*

The defendant in error filed a petition for a rehearing. The opinion of the court in denying this motion will be found in Volume 122.