## JOHN MINTO, RESPONDENT, v. WILLIAM DELANEY, APPELLANT.

NAVIGABLE STREAM—BOUNDARY OF RIPARIAN OWNER.—Where a navigable river was meandered in making the public surveys, and the United States has granted the land bounded by the meander line, the grantee takes the river. The stream and not the meander line is the true boundary of the riparian owner.

IDEM—ACCRETIONS.—Accretions to such land belong to the riparian owner, and can not be selected as swamp and overflowed land.

APPLICATION TO PURCHASE—CLOUD UPON TITLE.—An application filed in the office of the secretary of state to purchase such accretions as swamp and overflowed land, is a mere nullity and casts no cloud on the title of the riparian owner.

APPEAL from Marion County. The facts are stated in the opinion.

*Knight & Lord*, for appellant:

The alleged cloud upon respondent's title to the land which he claims to own by accretion, is an application by the appellant, filed in the office of the secretary of state, of the state of Oregon, on or about the eighteenth day of March, 1872, for the purchase of said land from the state of

Oregon, as swamp and overflowed land. This casts no cloud on the respondent's title, if he has any.

Under the law of 1870, providing for the selection and sale of the swamp and overflowed lands belonging to the state of Oregon, it is made the duty of the board of commissioners for the sale of school and university lands, in case the office of commissioner of lands is not created by law, to appoint suitable persons to select in the field all the swamp and overflowed lands within this state, and to describe each tract, either by legal subdivisions or by actual survey, and make returns of the same to the board. When the selection of these lands in any county is completed, the board are to make out maps and descriptions thereof in duplicate, one copy to be kept in their office and the other to be filed in the office of the county clerk of the county in which the lands may be located. The county clerk then sends to the board his official certificate of the date of their filing in his office. The board is then to give public notice in some newspaper published in the county, if there be one, if not, then in some newspaper he may select in an adjoining county, for four weeks, of said completion, approval and filing.

Any of the persons enumerated in section 3 of said act may become an applicant for the purchase of any of said lands by filing his application therefor, describing the same by the actual survey, or if no survey has been made, then by other artificial or natural landmarks. Within ninety days after the public notice as aforesaid, twenty per centum of the purchase-money shall be paid by the applicant to the board. After these preliminary steps by the state to secure a patent to these lands, the state's listing and segregation, must, under the laws of the United States, be approved and adopted by the proper officers of the United States government before patent to these lands can issue to the state.

Now it does not appear from the complaint that the agents of the state ever selected this land as swamp land, or that it was ever returned to the board, or that the board ever approved such selection, or made any maps of the same, or

filed any description of the land in the office of the county clerk of Marion county, or have on file in their office any description of this land, or that the applicant has paid any part of the purchase-money, or that the government of the United States has ever approved any selection of this land by the state, if it was ever selected.

Nothing appears from the complaint that the state has or claims any right to this land as swamp and overflowed. It is a bare possibility that the state may select this as swamp land and secure a patent to the same. Here, then, is nothing but a bare application by a stranger to purchase land from another stranger who has not, nor claims to have, any muniments of title to the land so far as the complaint shows. Such a paper does not, under section 500 of the code, constitute such an adverse claim, estate or interest in real property, as casts any cloud upon title. "The true test by which the question, whether a deed would cast a cloud upon the title of the plaintiff may be determined is this: Would the owner of the property, in an action of ejectment brought by the adverse party, founded upon the deed, be required to offer evidence to defeat a recovery? If such proof would be necessary the cloud would exist, otherwise not." (*Pixley* v. *Higgings*, 15 Cal. 127, cited and approved in *Curtis* v. *Sutter*, 15 Id. 264; *Lick* v. *Ray*, 43 Id. 84–88; *Cox* v. *Cliff*, 2 Comstock, 122.)

"It is not enough that the deed which is sought to be set aside may, possibly, be a cloud on the plaintiff's title, but it must clearly appear that the claim set up under such deed is, in fact, in hostility to the plaintiff's title." (*Hartman* v. *Reed*, 50 Cal. 491.) "Equity will not interfere where an act *in pais* is complained of as a cloud on title where the act itself does not, without concurring facts and circumstances proved *aliunde*, establish any interest in or title to the premises." (3 Daily (N. Y.), 75.)

"In order to induce a court of chancery to order a writing to be canceled or surrendered, as constituting a cloud upon title, it must at least be an instrument which upon its face is, or with the aid of extrinsic facts may be, some evidence of a right adverse to the plaintiff's." (115 Mass. 94.)

" To constitute a cloud upon the title of lands, there must be some color of title shown in the defendant. The conveyance of land by the grantor, who sets up no title whatever, does not cast any cloud over the title of the true owner." (51 Mo. 60.)

"The doctrine of the common law as to the navigability of waters, has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or indeed, any test at all of the navigability of waters. Those rivers must be regarded as public navigable rivers in law, which are navigable in fact, and they are navigable in fact when they are used or susceptible of being used in their ordinary conditions as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." (*The Daniel Ball*, 10 Wall. 557; 3 Or. 455.

The Willamette river being navigable in fact, is therefore navigable in law, and the common law consequences of navigability attach to the legal navigability of that river, and its bed and shores to high-water mark belong to the state. (*Pollard's Lessee* v. *Hagan*, 3 How. 219, re-examined and confirmed in *Goodlittle* v. *Kibble*, 9 Id. 471; 3 Iowa, 1; 32 Id. 106.)

Riparian proprietors on navigable rivers own the fee of the soil to high water-mark and no further. (*Chapman* v. *Kimball*, 9 Conn. 40, and cases above cited.) Public grants are construed strictly, and nothing can be taken by implication. A grantee of the United States government can not take in fee any land beyond the lines of the original survey where those lines are made the boundaries of his grant. (1 Black. 204; 5 Wend. 444, 460, 464.)

*J. A. Stratton,* for respondent:

The meander lines of a tract of land bounded by a river, as marked on the plats and surveys of the United States, constitute, as between persons claiming under the United States, the boundary of the river. Every grantee of the United States whose land is bounded on any side by the meander line of a stream is to that extent a riparian pro-

prietor, and entitled to all the incidents of such ownership at the common law. (10 Peters. 716; 3 Scammon, 522; *Bates* v. *Ill. Central R. R. Co.*, 1 Black. 208; *Railroad* v. *Schurmier*, 7 Wall. 273; *Yates* v. *Milwaukee*, 10 Id. 497.)

But if the rule were otherwise, then the plaintiff would take to low-water mark, whether within or beyond the meanders. (*Railroad* v. *Schurmier, ubi supra*, and 20 Minn. 82; 1 Black. 32; 13 N. Y. 296; 23 Wall. 64; 28 Penn. 206.) Such land is not comprehended within the meaning of the act in relation to tide and overflowed land. (Laws of 1872, p. 129 *et seq.;* 40 Cal. 471.) A suit will lie to determine such a claim as is set up by defendants. (1 Story Eq. Jur., p. 709, sec. 711 a; 21 Conn. 488; 18 N. Y. 515; 2 Black. 445; 50 Miss. 367; 42 Ind. 49; 34 Vt. 485; 10 Nev. 376.)

By the Court, KELLY, C. J.:

The respondent, who was the plaintiff in the court below, is the owner of a tract of land in Marion county, described in the complaint as lot No. 5 in section 27, and lots 2 and 4 in section 28 of township 7, south range 3 west of the Willamette meridian, the same being a portion of a larger tract of land originally granted by the United States to O. M. Pringle, under the act of congress known as the Oregon Donation Law, approved September 27, 1850. Since the land was granted to Pringle the Willamette river has changed the boundaries of the tract owned by respondent, so that they do not now conform to the descriptions in the original surveys and plats of the United States. The river has encroached upon and washed away some portions, while there have been gradual accretions to other parts of the land. These accretions are claimed by the respondent by virtue of his ownership of the adjacent land.

In his complaint the respondent alleges that he is the owner and in possession of this alluvion. He further alleges that the appellant, on or about the fifteenth day of March, 1872, filed in the office of the secretary of state for the state of Oregon an application to purchase these accretions to his lands from the state of Oregon as overflowed or tide lands, and that he claims the right under that application to

enter upon and use them. He avers that this claim of the appellant is a cloud upon his title, and asks that it may be removed by a decree declaring that the appellant has no interest whatever in these accretions to his land.

The answer of appellant denies the right of respondent to this alluvion, and among other denials and averments says, "That said land lies between high and low water of the Willamette river, and that the most of said land was so situated at the time of the survey of said island by the United States."

To this portion of appellant's answer there was a demurrer by respondent, which was sustained by the court below. The plat of original surveys shows that when the meander line was run, a small portion of land was left between it and the water of the Willamette river, and it was to this land that the accretions, referred to in the pleadings, were added. And the question is whether the meander line as it was actually run, or the meandered stream, is to be considered the true boundary of the lots mentioned in the complaint. Whatever doubts may heretofore have been entertained upon this subject, they were removed by the decision of the supreme court of the United States in the case of the *Railroad Company* v. *Schurmier*, 7 Wall. 272.

In that decision the court says that: "Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows to a demonstration that the water-course, and not the meander line, as actually run on the land, is the boundary."

Adopting this construction in regard to grants of the public lands, we hold that the river, and not the meander line, was the boundary of the lots owned by the respondent.

The evidence shows that several acres have been gradually added to the lots since the original surveys were made, by

the accretion of gravel, sand and loam washed by the floods from the upper portion of the Pringle island and from the opposite shore of the river. This alluvion the respondent claims belongs to him as a riparian owner, and this court so decides.

It is a well established principle that formations by slow and gradual accretion belong to the owner of the land when made by a stream forming his boundary and opposite thereto. (11 Ohio, 314.) But it is insisted by the appellant that his application to purchase the accretions to respondent's land, filed in the office of the secretary of state on the eighteenth day of March, 1872, does not cast a cloud on the respondent's title such as requires the interposition of a court of equity to have removed, and that therefore these proceedings ought to be dismissed.

Section 500, on page 212 of the civil code, provides that "any person in possession, by himself or his tenant, of real property, may maintain a suit in equity against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate or interest."

Courts of equity have long exercised the right to remove a cloud from the title of a person in possession of real property where there is an adverse right or claim which in conscience ought not to be asserted, and this section merely recognizes a well-settled principle of equity practice, which has always prevailed in those courts, of ordering illegal deeds and other written instruments delivered up and canceled. But where the illegality of the agreement, deed or other instrument appears upon the face of it, so that its nullity can admit of no doubt, the same reason for the interference of courts of equity to direct it to be delivered up or canceled would not seem to apply. (1 Story's Eq., sec. 700 a.)

In *Cox* v. *Clift*, 2 Comstock, 122, the court of appeals lays down the rule thus: "Whatever opinions may have formerly obtained, it now seems to be established that, whenever it is apparent, from the writing or deed itself, that no danger to the title or interest of the complainant is to be apprehended, a court of equity will not entertain a bill for

the cancellation or delivery of the instrument. Nor is there any reason why a party should be allowed to resort to the expensive remedy of a suit in chancery to procure the relinquishment of a right which it is obvious the defendant never possessed, and against which, if asserted, the complainant had a perfect legal defense written down in the title deeds of his adversary."

In the case of *Nickerson* v. *Loud*, 115 Mass. 97, Gray, C. J., delivering the opinion, says: "In order to induce a court of chancery to order a writing to be canceled or surrendered, as constituting a cloud upon title, it must at least be an instrument which upon its face is, or with the air of extrinsic facts may be, some evidence of a right adverse to the plaintiffs." So, also, in the state of Missouri, the supreme court declares that "to constitute a cloud upon the title to lands, some color of title must be shown in the defendant." (*Dunklin County* v. *Clark*, 51 Mo. 60.)

The supreme court of California, construing a statute quite similar to our own, says the true test is: "Would the owner of the property, in an action of ejectment brought by the adverse party, founded upon the deed, be required to offer evidence to defeat a recovery? If such proof would be necessary the cloud would exist; if the proof would be unnecessary, no shade would be cast by the presence of the deed." (*Pixley* v. *Huggins*, 15 Cal. 133.)

Applying the test laid down by the courts in these several states to the case under consideration, we are at a loss to see how in any way the claim of appellant can be a cloud upon the title of respondent. All there is of it is an application filed by the appellant in the office of the secretary of state to purchase as swamp and overflowed lands certain lands, mostly alluvion, which lie between the river and the meander line of the lots in the Pringle donation claim, now owned by the respondent. We have already stated that the river and not the meander line is the boundary of these lots, and as a necessary consequence there is no land to which the appellants' application can attach. Where a river is designated in a patent as the boundary of a tract, the legal deduction is that no land was left between the tract and the

river which could lawfully be granted to another. And it being legally impossible for the state to select as swamp and overflowed land that which is specified in the application, it follows as a matter of course that the application itself amounts to nothing, and must be treated as a nullity. The case of *Taylor* v. *Underhill*, 40 Cal. 471, is in many respects similar to this one. Taylor surveyed and claimed as swamp and overflowed land the sloping bank and lands covered by high tide of the Sacramento river, and obtained a certificate of purchase from the state. Underhill, the riparian owner, brought an action to restrain him from obtaining a patent for the strip of land in front of his (Underhill's) land, and to remove the cloud upon it. After hearing the case, the court below dismissed the plaintiff's bill, and this judgment was affirmed by the supreme court. Temple, J., delivering the opinion of the court, says: "It (the court below) found that the land in controversy is below high-water mark, and that the tide ebbs and flows over it; and as a conclusion of law, that neither party could purchase the land as swamp and overflowed land. The certificate of purchase was therefore void, and his patent, if he obtained one, would also be void, and no injury could result to plaintiff from defendant's claim.

"Upon the facts found in this case there can be no doubt but that the certificate of purchase was improperly issued to the defendant, and if those findings are true, it is somewhat surprising that he has been able to proceed so far with his application as to obtain his certificate. It could not have been intended in authorizing the sale of swamp and overflowed land to enable persons to obtain titles to lands under the navigable waters which are incapable of being reclaimed for agricultural purposes, and which could not be utilized without materially interfering with navigation. While, however, the attorney for plaintiff admits that the patent which the defendant may obtain would be invalid when these facts should be made to appear, he claims that it would not be void upon its face, but it would require evidence *dehors* the patent to show its nullity, and therefore its possession would be injurious to the plaintiff.

"We think the plaintiff is correct as to the effect of the patent, but, we do not see upon what principle the court will give him relief. The claim of the defendant is not a cloud upon his title. There is no claim to any portion of his land."

The court affirmed the judgment and dismissed the bill, and yet in asking the interposition of a court of equity to remove a cloud from plaintiff's title, that case was a far stronger one than this. There a certificate of purchase was issued. Here there was none and never can be.

The respondent has a perfect title to the land in controversy, and is in possession of it; and there is no way by which his adversary can obtain a standing in court to disturb that possession or assail the title. It follows as a necessary consequence that this suit ought not to have been brought to remove a cloud from a title where none existed.

The decree is reversed and the complaint dismissed.

Mr. Justice BOISE having tried this case in the court below, did not sit in the hearing on appeal.—[Reporter.]

