**UNITED STATES v. OTLEY et al.**
No. 9696.

Circuit Court of Appeals, Ninth Circuit.
April 21, 1942.

Norman M. Littell, Asst. Atty. Gen., John F. Cotter, W. Robert Koerner, Charles R. Denny, and Clifford E. Fix, all of Washington, D. C., Benjamin Catchings, Senior Atty., United States Department of Agriculture, of Atlanta, Ga., and Carl C. Donaugh, U. S. Atty., J. Mason Dillard, Asst. U. S. Atty., and Hugh L. Biggs, Sp. Atty., all of Portland, Or., for appellant United States.

John W. McCulloch and Edwin D. Hicks, both of Portland, Or., and Robert M. Duncan, of Burns, Or., for appellants Otley et al.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

The United States appeals from a judgment holding that certain lands in Malheur Lake, a non-navigable body of fresh water in Oregon, were bordering upon lands transferred by fourteen of its patents to the predecessors in interest of certain appellees, and declaring they were lands conveyed by the patents. The United States is hereinafter called the "plaintiff" and these appellees, defendants below, the "patentees."

The areas of land under the lake so held to be conveyed were for each patent those between "ordinary" or "mean" high water lake boundary of the patent and two lines extending to the center of the lake from the opposite ends of the shore boundary, save as to certain islands in the lake. On making this declaratory judgment, the district court retained for future computation and decision the areas in the lake conveyed by each patent.

Certain of the patentees appeal from the decision that the lake islands were not included in the patented land.

Certain other appellants, hereinafter called the "adverse claimants," also appeal from the judgment's holding that, though lands in the lake were patented to certain of the patentees, they have not been acquired by the adverse claimants by holding them adversely for the Oregon statutory period.

Plaintiff's complaint alleges that it is the owner in fee simple of some 47,760.40 acres of unsurveyed land lying within the boundary lines of Lake Malheur Reservation, a refuge for the breeding and protection of migratory birds, reserved by order dated August 18, 1908, made by President Theodore Roosevelt.

The reserved area is more particularly described in a map attached to and made a part of the Executive Order entitled "Lake Malheur Reservation Oregon," and hereinafter called the Roosevelt map.

The map shows two unsurveyed connecting bodies of water, Lake Malheur and Lake Harney, surrounded by fractional lots of land with one or more of the boundary lines of each lot the shore line of one or the other of the lakes, the Reservation

consisting of the fractional sections and unsurveyed land in the lakes. The plaintiff's exhibit of the Executive Order and map particularly describes the fractional lots (which include those patented to the patentees) as the "smallest legal subdivisions which touch the shore lines of Lakes Malheur and Harney," and is as follows:

# LAKE MALHEUR RESERVATION

## OREGON

*Embracing all least subdivisions touching the shore lines of Lakes Malheur and Harney and their connecting waters in Tps. 25 S. Rgs. 32, 32½ and 33. Tps. 26 S. Rgs. 29, 30, 31, 32 and 33., and Tps. 27 S. Rgs. 29, ˆ ₂, 30 and 32 all east of Willamette Meridian, Oregon. segregated by broken line and designated "Lake Malheur Reservation"*

## Executive Order.

❖ ❖ ❖

It is hereby ordered that all smallest legal subdivisions which touch the shore line of Lakes Malheur and Harney and the streams and waters connecting these lakes in township twenty-five south, ranges thirty-two, thirty-two and one-half and thirty-three; township twenty-six south, ranges twenty-nine, thirty, thirty-one, thirty-two and thirty-three; township twenty-seven south, ranges twenty-nine, twenty-nine and one-half, thirty and thirty-two, all east of the Willamette Meridian, Oregon, together with all islands and unsurveyed lands situated within the meander lines of said lakes and connecting waters, as segregated by the broken line shown upon the diagram hereto attached and made a part of this Order, are hereby reserved, subject to valid existing rights, and set aside for the use of the Department of Agriculture as a preserve and breeding ground for native birds. The taking or destruction of birds' eggs and nests, and the taking or killing of any species of native bird for any purpose whatsoever, except under such rules and regulations as may be prescribed by the Secretary of Agriculture, is prohibited, and warning is expressly given to all persons not to commit within the reserved territory any of the acts hereby enjoined. This reserve to be known as Lake Malheur Reservation.

THEODORE ROOSEVELT

*August 18, 1908.*
THE WHITE HOUSE,
[No. 929.]

The complaint applies to the Lake Malheur area of the reserve the term "Malheur Division." It alleges that the exterior boundaries of the Malheur Division, consisting of the 47,760.40 acres of unsurveyed area, except the closing line between the two lakes, were surveyed by one John H. Neal for the General Land Office. This survey, hereinafter called the Neal survey, coincides with the "shore line of Lake Malheur" as platted in the Roosevelt map included in the reserve order.

The complaint also alleges that the defendants, although they have no right or title thereto, claim an interest in portions of the 47,760.40 acres of the Lake Malheur area as shown on the Roosevelt map and that they have been and are trespassing upon the plaintiff's reserved lands, using them for pasturage and hay cutting and other economic uses, for which plaintiff is entitled to damages and to rental for the occupancy thereof.

The complaint also alleges that the interests of the defendants are conflicting inter se and that they are large in number and hence they are joined in a single suit. Its prayer is for a determination of plaintiff's and defendants' rights in the Malheur Division of the Lake Malheur Reservation and, in effect, this is a suit by the plaintiff to quiet its title to the entire area shown on the above map as Lake Malheur.

All the defendants answered, denying the allegations of the complaint concerning the plaintiff's claim of title to the lands described on the Roosevelt map as Lake Malheur, which front the patented border lots of those having the "valid existing rights" referred to in the Order. Certain defendants claimed certain lands within that area by virtue of either homestead or desert land patents which their predecessors in interest received from the plaintiff. These patents were to certain of the bordering lots, which they claim, under the law of Oregon controlling the plaintiff in transferring its lands in that state, also conveyed the lands in the lake from their lake shore boundaries to the center of the lake.

The answers of the adverse claimants set up they claimed by adverse possession land in the lake bed by virtue of holding it adversely to the fractional lot patentees alleged to own the land between their shore boundaries and the lake center.

Each of the defendants sets up a counterclaim describing his fractional lot as bordering on a true meander line of Lake Malheur as shown in the Neal survey or describing the lands claimed adversely in the lake area, and they joined in the prayer that the rights of the parties in the lake lands be determined.

The plaintiff replied to the effect that the body of water known as Lake Malheur was vagrant in nature and varying widely in elevations and area with the seasons of the year, and alleged that the meander line of the Neal survey did not truly meander the lake at its mean high water mark nor approximately at the water levels of Lake Malheur nor at the existing shore line thereof, and that the plats of the fractional sections shown as bordering on the shores of the lake in the Roosevelt map had the meander line merely as a boundary thereof and not as the meander line of the lake; and that "neither the said Commissioner of the General Land Office nor the said Surveyor General nor the said John H. Neal knew the elevations within said Malheur Division and as a result of their ignorance thereof and of the gross inaccuracies of the said survey lines as 'meander lines' the General Land Office grossly and erroneously approved and platted the said survey so as to show all of the said Malheur Division as 'Malheur Lake' and the above described fractional townships and lots as abutting thereon and extending to the shore lines thereof. That if in fact the waters within said Malheur Division constituted a lake, its boundaries did not and never have coincided even approximately with the said Neal Survey Lines. That insofar as said waters constituted a permanent body of water, its true boundaries would have more accurately coincided with the contour line of an elevation of 4090 feet above sea. level."

The case had an extended trial at which a great volume of evidence was introduced. The district court held with the defendants that it had been shown affirmatively that the plats were correctly drawn to border upon the Neal meander line which was a true meander line of the lake; that the lake shore was their true boundary, and that the patents covered the adjoining land in the lake.

With respect to the issue tendered by the adverse claimants, who offered proof that they had fenced in lake bed land of

certain patentees for the statutory period, the district court made no findings, but adjudged they had no title by adverse possession. These appeals followed.

A. *Appellees' patents embody the plats showing their upland borders in Malheur Lake, and hence by their terms convey the adjoining land in the lake bottom. The suit, in effect, is one to cancel fourteen patents as to part of the land they convey in which an exceptional heavy burden rests upon the United States.*

It is agreed by the parties that the Oregon law controls the transfers of land by the patents and that if the fractional lots, which contain no reservation or exception of the lake land, are bounded (as described in the Roosevelt map) by the mean or ordinary high water mark of the shores of Malheur Lake, they also conveyed to the patentees the land in the bed of the lake bounded by the shore line of the patent and two lines from the opposite ends of the shore line to the lake's center.

█ The fourteen underlying patents on which the defendants rely are not in evidence. However, their terms are known and found by the district court. A homestead and a desert land patent for the lands in the Malheur Lake area are in evidence as typical of the others. In such homestead and desert land patents, after the description of the irregular lots, appears the words "according to the official plat of the survey of the said lands returned to the General Land Office by the surveyor general." The plats thereby became parts of the instruments of conveyance.

█ The Supreme Court holds that a meandered water boundary of a nonnavigable lake shown on the plat referred to in the patent made the shore of the lake the true upland boundary, and that the patent conveyed the title to the center of the lake, reasoning as follows: "The patent itself does not contain all the particulars of the survey, but the grant of the lands is recited to be according to the *official plat* of the survey of said lands, returned to the general land office by the surveyor general, *thereby adopting the plat as a part of the instrument.*" (Emphasis supplied) Hardin v. Jordan, 140 U.S. 371, 380, 11 S.Ct. 808, 811, 35 L.Ed. 428.

This case was followed in Chapman & Dewey Co. v. St. Francis Levee Dist., 232 U.S. 186, 197, 34 S.Ct. 297, 299, 58 L.Ed.

564, holding that such plats and the data thereon "are as much to be considered in determining what it [the patent] is intended to include as if they were set forth in the patent. Cragin v. Powell, 128 U.S. 691, 696, 9 S.Ct. 203, 32 L.Ed. 566."

Following Hardin v. Jordan, supra, the Supreme Court defines in detail the function of a platted meander line of a water boundary and reiterates the rule that the plat is a part of the patent, holding " * * * The difficulty of following the edge or margin of such projections, and all the various sinuosities of the water line, is the very occasion and cause of ruling the meander line, which by its exclusions and inclusions of such irregularities of contour produces an average result closely approximating to the truth as to the quantity of upland contained in the fractional lots bordering on the lake or stream. The official plat made from such survey does not show the meander line, but shows the general form of the lake deduced therefrom, and the surrounding fractional lots adjoining and bordering on the same. The patents when issued refer to this plat for identification of the lots conveyed, and are equivalent to and have the legal effect of a declaration that they extend to and are bounded by the lake or stream. Such lake or stream itself, as a natural object or monument, is virtually and truly one of the calls of the description or boundary of the premises conveyed; and all the legal consequences of such a boundary, in the matter of riparian rights and title to land under water, regularly follow." Mitchell v. Smale, 140 U.S. 406, 413, 11 S.Ct. 819, 821, 840, 35 L.Ed. 442.

The rule as stated in Mitchell v. Smale is approved in the more recent case of United States v. Lane, 260 U.S. 662, 665, 43 S.Ct. 236, 67 L.Ed. 448.

█ Each of these basic patents thus shows the lake as a naturally fixed call of the boundary to which the patented land extends. Hence the patents on their face assure the homesteader that his land is bounded by the lake, even though in any particular case the figured survey calls of the patent may not reach it.

Typical of these plat portions of the patent is that covering the lands of two of the present owners in Township 26 South, Range 32 East. It will be noted that the shore line in the lake is the same

as that in the Roosevelt map of Lake Malheur.

mination (and assurance to the homesteader) that it has been "accepted" by the

It will be noted also that the plat does not make the field notes of the survey a part of the patent. Instead, on its face, it contains plaintiff's administrative deter-mination by the United States Surveyor General for Oregon that the plat "is strict-mination by the Commissioner of the General Land Office and also plaintiff's administrative determination by the United States Surveyor General for Oregon that the plat "is strict-

ly conformable to the field notes of the [Neal's] survey thereof on file in this Office, which have been examined and approved."[1]

The weight of these administrative decisions in supporting the title of such homesteaders has always been recognized by the Supreme Court. Recent adjudication clarifying administrative law has given ever broader recognition of such decisions. Cf. Railroad Commission v. Rowan & Nichols Oil Co., 311 U.S. 570, 575, 61 S.Ct. 343, 85 L.Ed. 358.

Since each patent by its terms thus shows at one of its boundaries the admittedly non-navigable lake, it transfers the land to the center of the lake. The suit here is, in effect, to cancel fourteen such patents of the lake lands. In such a case the United States has a more than the ordinary burden of proof. To avoid such "solemn evidences of title emanating from the government of the United States under its official seal" requires the observance of the early established rule that it "cannot be done upon a bare preponderance of evidence which leaves the issue in doubt" even more than in suits between private parties for such cancellations. Only "that class of evidence which *commands respect,* and that amount of it which *produces conviction,* shall make such an attempt successful." United States v. Maxwell Land-Grant Co., 121 U.S. 325, 381, 382, 7 S.Ct. 1015, 1029, 30 L.Ed. 949.

This burden on the United States seeking to cancel a patent is again held in Wright-Blodgett Co. v. United States, 236 U.S. 397, 403, 35 S.Ct. 339, 341, 59 L.Ed. 637, as follows: " * * * Where a patent is obtained by false and fraudulent proofs submitted for the purpose of deceiving the officers of the government, and of thus obtaining public lands without compliance with the requirements of the law, while the patent is not void or subject to collateral attack, it may be directly assailed in a suit by the government against the parties claiming under it. *In such case, the respect due to a patent,* the presumption that all the preceding steps required by the law had been observed before its issue, and the immense importance of stability of titles dependent upon these instruments, *demand that suit to cancel them should be sustained only by proof which produces conviction.* United States v. Minor, 114 U. S. 233, 239, 5 S.Ct. 836, 29 L.Ed. 110, 112; Maxwell Land-Grant Case [United States v. Maxwell Land-Grant Co.], 121 U.S. 325, 381, 7 S.Ct. 1015, 30 L.Ed. 949, 959; United States v. Stinson, 197 U.S. 200, 204, 205, 25 S.Ct. 426, 49 L.Ed. 724, 725; Diamond Coal Co. v. United States, 233 U.S. 236, 239, 34 S.Ct. 507, 58 L.Ed. 936, 939." (Emphasis supplied).

The incidence of the burden and the quantum of proof is a procedural matter and the decision in Wright-Blodgett Co. v. United States controls in a suit in the district court to set aside a patent of lands.

It is true that the Supreme Court has held that patents embodying fraudulently procured or grossly erroneously approved plats with meandered boundaries do not convey the land abutting the meander. However, it is significant of the heavy burden in such cases that in none has the Supreme Court reversed a decision holding the boundary a true meander line. In all, the affirmances were after both lower federal and state courts had held there was fraud or gross error. In the latest of these, speaking of the rule which made the meandered plat referred to in the patent as a "part of the conveyance and the water itself constitutes the boundary," the court describes the burden of proof, saying the rule "will not be applied where, as here, the *facts conclusively* show that no body of water existed or exists at or near the place indicated on the plat or where, as here, there never was, in fact, an attempt to survey the land in controversy." (Emphasis supplied). Jeems Bayou Club v.

---

[1] The making of survey plats embodied in plat books by the surveyor general is required by the Act of May 18, 1796, c. 29, sec. 2, 1 Stat. 465, made applicable to the United States Surveyor General resident in Oregon by the Act of September 27, 1850, c. 76, sec. 1, 9 Stat. 496. The administrative practice and decisions of both the Commissioner of the General Land Office and the Surveyor General stem from section 13 of the latter act, which provides that it is the duty of the Surveyor General under the direction of the Commissioner of the General Land Office to cause proper tract books to be opened for the lands in Oregon. The approval of the plat by the Commissioner is a part of the "direction" of the statute. Cf. Thompson v. Consolidated Gas Corp., 300 U.S. 55, 69, 57 S.Ct. 364, 81 L.Ed. 510; Pacific States Co. v. White, 296 U. S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853.

United States, 260 U.S. 561, 564, 43 S.Ct. 205, 206, 67 L.Ed. 402.

In Lee Wilson & Co. v. United States, 245 U.S. 24, 29, 38 S.Ct. 21, 23, 62 L.Ed. 128, the plat was held not a part of the patent "as the result of the *conclusive finding* [*of fact*] as to the mistake committed concerning the existence of the lake and the consequent error in the survey."[2]

It is with this character of the burden to show that the homestead and desert land patents do not convey the lake land included in the plats embodied in the patent, that is to be considered the plaintiff's claim of error in the district court's affirmative finding "That at the time the said Neal survey was made, approved and platted as herein stated, each of the lots and tracts of land made fractional by the survey and meander line then bordered upon was riparian to Malheur Lake, as shown by the plats and field notes filed in the General Land Office of the United States, and in the local land office where such lands were situated."

B. *It is shown affirmatively that the plaintiff intended to convey the Malheur Lake lands with the patents to the littoral lands, contrary to the claim of plaintiff that it had no such intent.*

The Oregon and Federal law giving to littoral owners the adjoining land of a non-navigable lake has been well summarized, and the intent of plaintiff to convey them appears in a decision of the then Secretary of the Interior, Hoke Smith, in a letter dated December 3, 1894, to the Commissioner of the General Land Office. This letter, in directing the re-survety of lands bordering Malheur Lake (made shortly thereafter by Neal) to eliminate doubts arising from a prior survey, states, in part:

"In the case of Hardin v. Jordan (140 U. S. 371 [11 S.Ct. 808, 35 L.Ed. 428]), the Supreme Court held that riparian proprietors owning lands bordering upon a non-navigable lake in the State of Illinois, where the common law rule prevailed, take to the center of the lake. * * * It was also held in Hardin v. Jordan, that the riparian rights of owners of lands upon such non-navigable bodies of water were subject to local law, the common law doctrine being applied thereto in states only where no statutory provision exists to the contrary."

"By decision of the Supreme Court of the State of Oregon in the case of Minto v. Delaney (7 Or. 337), the common law rule is applied to non-navigable lakes in that state; hence *owners of land upon Lake Malheur having riparian rights, take to the center of that lake.*" (Emphasis supplied). 19 L.D. 439; Cf. 30 L.D. 521.

The plaintiff has not proved or even offered to prove any instruction or ruling of the Land Department that the lake lands were to be excluded from patents to the littoral lands. It is apparent from this public declaration of plaintiff's Secretary of the Interior in 1894, providing for the survey of the lake, that plaintiff, through its duly constituted representative in the sale of public lands, declared its intent that any subsequent unrestricted patents of lands bordering on Malheur Lake would convey the abutting lands to the lake's center.

It is also apparent that homesteaders, so advised by Secretary Smith's published expression of intent, would seek and pay for and acquire all the lands conveyed both upland and lake bottom. How long these homesteaders had been settled there does not appear, but half their entries were before the end of the year after the ordered survey was platted and approved by the Surveyor General in October 1895. All the remaining entries were within five years after the approval of the plats, save two, which were made within seven years. Many of the names of the successors in interest are of the original patentees and the evidence shows that families of the homesteaders were raised about the lake. The *case of the twelve defendant groups of individuals has none of the incidents of land grabbing* attempted by certain stock raising and other corporations of the Far West.

In their answer to this suit to quiet title, the patentees have properly pleaded only the irregular small fractional lots on the shores of Malheur Lake as appearing on the plats of the Land Department, which, as later appears, are embodied in and a part of the description of the patent. Plaintiff's brief and argument, in discussing the intent of plaintiff, lays great stress on the contrast between the small acreage in the border lots and that which it asserts (but did not prove) lies between the lots and the center of the lake. Plaintiff claims that the ordinary preponderance of evidence is all the Government need show.

[2] An earlier case, French-Glenn Live Stock Co. v. Springer, 185 U.S. 47, 54, 22 S.Ct. 563, 46 L.Ed. 800, seems to hold

that all it "sold" was the fractional acreage. Whatever else the patents conveyed, it claims, was "given away."

We find no merit in this argument. It is no more appropriate to say that plaintiff, through its Secretary of the Interior, intended to sell and that it "sold" the upland only and "gave away" the laterally extending lake land, than it would be to say that a deed to land "sold" it, while the grantor merely "gave away" the trees of the forest vertically growing out of it, or the twenty-story apartment house erected vertically on it.

A non-navigable lake may be bordered by a worthless stony plateau for which no one would pay a cent an acre, yet, with the reclaimable alluvial land in the lake bed conveyed with it, one may pay at the rate of a hundred dollars for the stony area. In Oregon, the owner of, say, 100,000 acres of land surrounding a non-navigable lake of 30,000 acres, may convey a narrow strip of land of an area of 100 acres surrounding and bordering on the lake. His deed transfers 30,100 acres by virtue of its description of the surrounding 100 acres.

■ If the patents are to lands bordering the lake, the patents purport, on their face, to transfer the acreage of the lake bottom. Cases, later considered, discussing the disproportion of acreage described in a patent and that *between* its measured calls and a water boundary, present an entirely different issue. None suggests that if the land is bounded by a non-navigable lake the adjoining land to the center of the lake is conveyed only if the lake is very small, and not conveyed if the lake be larger.

■ Another unproved assertion of plaintiff with respect to its burden of proof of its lack of intent so to convey the portions of the lake bed, is that the United State Surveyor General resident in Oregon "did not know the elevations within said Malheur Division" and hence "grossly and erroneously approved and platted the said survey [of 1895] so as to show all the Malheur Division as Malheur Lake and the * * * described fractional townships and lots as abutting thereon and extending to the shores thereof." Not only is there no evidence at all to sustain plaintiff's burden as to absence of knowledge in the resident Surveyor General, but he, by his approval of the Neal survey and plats, is charged with knowledge of Neal's meander line, its courses and distances, and every item of description of the soil of the abutting upland and the aquatic vegetation of the tule marshes, both under the ordinary high water mark of the lake and above it.

Contrary to this contention of a lack of knowledge of the terrain, plaintiff itself, thirteen years after the administrative decision approving the plats, made the Lake Malheur migratory bird reservation of the lake pleaded in the complaint, naming it, as it is named in the plats, Malheur Lake. The attention of the resident United States Surveyor General had been drawn to the federal lands in the Malheur Lake basin since long before 1877, when the first Government survey was made by Deputy Surveyor Meldrum under the direction of the then Surveyor General.

The lake as then surveyed had much wider boundaries. Large livestock corporations acquired lands then platted. There was much litigation and controversy, necessarily known to the plaintiff's land agents. It was claimed that due to climatic changes and to a cut in its banks at its exit drainage, its area had shrunk. Early in the first decades of this century, came the public awakening as to its value as a breeding ground for the, by then, rapidly diminishing volume of migratory water fowl. It is idle to say that the several resident United States Surveyor Generals and other officials of the Interior Department, or the plaintiff's officers in the Department of Agriculture who sought and obtained the control of the Malheur Lake bird reservation, had not studied the elevations and general conditions of the terrain in their respective jurisdictions.

■ The record shows that under plaintiff's prior administrative officers, border lots of other homesteaders alongside defendants', and whose patents are the same as those of the patentees, have been repurchased to enlarge plaintiff's holdings in the reservation. The present administrative officers are treating the homesteaders otherwise, but, in this case, Theodore Roosevelt's map, a public document showing Malheur Lake bordering on the patentees' lots, is strong evidence. This is true whether or not it can be taken as an admission by plaintiff's President against plaintiff's interest in the patentees' lands held under a claim of "valid existing rights", or under the usual rule regarding such a map in such a relevant public document as the pleaded reservation Order, in suits seeking to destroy rights created by

homesteaders' patents issued over forty years ago. We find no merit in plaintiff's contention that it did not intend to convey the lake bed in its patents to lands bordering its ordinary high water mark.

C. *Plaintiff has not proved any, much less an unusual amount of land between the meander line of the patentees' patents and the shore of Lake Malheur.*

Plaintiff relies on Jeems Bayou Club v. United States, 260 U.S. 561, 564, 43 S.Ct. 205, 67 L.Ed. 402; Lee Wilson & Co. v. United States, 245 U.S. 24, 29, 31, 38 S. Ct. 21, 62 L.Ed. 128, and French-Glenn Live Stock Co. v. Springer, cited supra, with reference to the burden of making "conclusive" proof in the present case. These cases hold that if the amount of land between the surveyed meander line and the *shore* of a lake or stream greatly exceeds the area in the measured calls in the patent, the meander will not be considered that of the stream or lake, but a mere irregular boundary of the upland. It claims it has sustained its burden of proof that such excess exists as to these homesteads, and hence that the patents, though including the approved plats, do not transfer any lands in the lake.

■ Plaintiff's argument on this contention confuses this area between the surveyed meander line and the ordinary high water mark[3] of a non-navigable lake and the area of land under the lake to which the upland owner is entitled when his boundary is the ordinary high water line. It would have us add together both such land above ordinary high water mark and that below it to the center of the lake and compare the total with that within the figured calls of the patent. Obviously this is unwarranted and grossly unfair to the homesteaders. Equally unfair is the attempt to make the comparison with the small fractional lots pleaded and not with the whole 160 or 320 acres of the patents, of which the small lots border the lake.

■ The evidence shows that to none of the fourteen patents is applicable this rule regarding the excess of acreage between the meander and the shore and the land patented.

Plaintiff relies upon the opinion of a Land Department employee that *somewhere* about the seventy-six square miles of the Neal survey there are below the 4,093-foot

level some 7,991.2 acres. How much of this acreage consists of islands in the lake and how much, if any, is upland between the Neal meander and the lake does not appear. Neal's meander line is not shown to be placed at 4,093 feet, but, assuming that it were, and assuming also that all the acreage is between the meander line and the lake shore, such evidence does not aid plaintiff.

With all the facilities of the Land Department at its command to make such proof, plaintiff tried and submitted its case without locating any of this alleged unsurveyed upland acreage. Plaintiff ignores that what its complaint brought to the district court is some twelve different suits to quiet title, in each of which it seeks to take from each of the several defendants land to which it has given a patent which, on its face, declares the land to be his.

■ Neither plaintiff's brief nor argument points to any evidence that there is any land whatsoever, much less a disproportionately large amount, between the meander boundary of any one of the patentees' fourteen patents and the ordinary high water line of the lake. Nor is any such land disclosed by our unaided search of the voluminous record. In such a situation, the evidence of the face of the patent with its administrative determination of the boundary has not been overcome. Against this contention of the plaintiff, we sustain the district court's finding that the meander line truly meanders the lake shores.

D. *Plaintiff has not sustained its burden of proving that in 1895 there was no such body of water as Malheur Lake or, assuming its existence, that Neal did not truly meander it. The evidence sustains the district court's affirmative findings to the contrary.*

■ Malheur Lake appears as a large body of water on the maps of Oregon in the atlases of the Century Dictionary. Cf. Rand McNally Commercial Atlas and Encyclopedia Britannica. Significantly it so appears on the Roosevelt map, no doubt prepared by the Biological Survey officials of the Department of Agriculture, to whose administration the lake area was given. As seen, it was platted as a lake by the Surveyor Generals resident in Oregon.

---

[3] In Oregon—Micelli v. Andrus, 61 Or. 78, 120 P. 737; Minto v. Delaney, 7 Or. 337, 338, 343; French Glenn Live Stock Co. v. Springer, 35 Or. 312, 58 P. 102.

The Supreme Court in United States v. State of Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267, appointed a Special Master to gather evidence and determine whether it was a navigable or non-navigable lake. It was found that four launches and the boats of trappers traveled over its waters but were so impeded by a growth of tule and other aquatic plants and by its irregular shallows that the Supreme Court held, that though a lake, it was not navigable and title to its bed did not pass to Oregon on its admission to the Union.

Much of the evidence regarding the difficulty of these boats in navigating through the tule and over the shallows was of the experiences after the year 1900. It was held relevant to the condition of Malheur Lake at the time of the admission of Oregon to the Union on February 14, 1859. Plaintiff has the burden of proof that there was no such lake in 1895, "at the time the survey was made." Lee Wilson & Co. v. United States, 245 U.S. 24, 28, 38 S.Ct. 21, 22, 62 L.Ed. 128. The evidence taken in United States v. Oregon, supra, was admitted in this case and was considered with that of witnesses appearing before the district court.

The opinion of District Judge Fee, who, incidentally, in the course of the litigation traveled over the Neal survey lines, admirably summarizes the known history of the lake and its various fluctuations in height and area and of the difficult conditions confronting Neal in his survey. Transcript, 380-409. It is sufficient to hold that its statements and the findings regarding the existence and character of the lake which follow it are more than amply supported by the evidence. We would make the same findings even were the burden of proof on the patentees to show the accepted plats of their patents with their lake boundaries were in fact true statements. As stated, the district court's findings were affirmative and hence disposed of the case regardless of the incidence and weight of the burden of proof.

The question whether plaintiff has sustained its burden of proof that the plats of Neal's survey do not truly meander the lake requires a more detailed consideration of its characteristics. Malheur Lake, like many other lakes in the arid and semi-arid West of the United States, is located in an almost level plain and fed by the melting spring and summer snows of distant mountains. The plain is the bottom of a basin without outlet, the waters flowing from the lake into Harney Lake from which, with the rapid evaporation into its desiccated air, no streams emerge. In the level terrain in which such lakes are located, the inflowing mountain waters of the spring and early summer season spread to great acreages from which they recede by evaporation and drainage in the drier late summer and fall months.

It is a matter of judicial knowledge that the rainfall in the mountain area varies greatly from year to year. In a single year a hot thaw may supply snow water and raise the lake level and widen its boundaries, and a later freeze in the mountains thin their streams so that the lake boundaries recede, to widen again with succeeding warmer weather. The traveling and hunting public was more familiar with this phenomenon in the Tulare Lake area in the San Joaquin Valley prior to the control of its supplying rivers for irrigation and power.

The plateau upon which Malheur Lake is located is over 4,000 feet above sea level. The plateau itself has an annual average rainfall of about eight inches. On this precipitation the desert land not touched by the lake waters produces nothing but sagebrush, greasewood, cacti and sand flowers.

In its dry mountain air an annual evaporation of some four feet is one of the major factors in diminishing the volume of the lake's water and its area. The flat character of the plateau is significantly indicated by the fact that at the 4,093-foot level, with somewhere in the neighborhood of 40,000 acres, but 26.8 acres are over five feet in depth. The lake's extreme high water mark is at an elevation of nearly 4,096 feet above sea level. Its lower water mark is between five and six feet less. This difference in feet of elevation is not unusual in any lake, but because of the flat terrain at its highest high water level it waters over 80,000 acres of land, while at low water but about 10,000 acres,—that is on an average of over 11,000 acres for a foot rise. Meldrum's 1877 survey covered the larger area. As shown, Neal's survey meander of the lake's ordinary or mean high water mark includes in it but 47,760.40 acres. Crops of hay are grown on the overflowed lands above the ordinary high water mark and below it as the lake recedes. In the short growing season of this altitude there are occasional crops of

grain. Where the water is more permanent there grows in it a heavy annual area of tule.

While from a distance such an area may appear as flat as a billiard table, over its surface are small variations in height which make very difficult the surveying of a meander line of the lake's border. Here are levels where the survey's variation of an inch may mean hundreds of acres in area. Plaintiff seeks to overcome here the district court's affirmative holding that Neal efficiently accomplished his task.

Neal was instructed to survey the lake under the Land Department survey regulations, one of which provided that "Meander lines will not be established at the segregation line between dry and swamp or overflowed land, but at the ordinary high-water mark of the actual margin of the rivers or lakes on which such swamp or overflowed lands border."

 The high water marks of any lake fluctuate with the waters of its supplying rivers and streams and with its evaporation. The "ordinary high-water mark" is a mean or average of these fluctuating Malheur Lake's extreme rises, which in vertical feet are about the same as those of Lake Michigan, described in Mitchell v. Smale, 140 U.S. 406, 414, 11 S.Ct. 819, 840, 35 L.Ed. 442. But, as seen, Malheur Lake bed and shores made for Neal a much more difficult survey than that of most lakes in the eastern United States.

Neal's field notes certify at each corner on his meander line that it is the "mean high water mark of Malheur Lake." In his certificate following the notes on each township appears the following or its equivalent, "In executing my contract of survey, I have extended the lines of survey to the mean high water mark of Malheur Lake to the best of my knowledge and belief."

Plaintiff contends these certifications are not a true compliance with the instruction not to establish meander lines "at the segregation line between dry and swamp or overflowed lands, but at the ordinary high water mark." This contention is based upon Neal's notes concerning some of the lake boundaries of the townships surveyed, containing such comment as "That part of Malheur Lake fronting this township consists of a tule marsh dry at the time of executing this survey."

Neal was directed to make his survey between October 1 and March 1, the period of lowest water of the lake. Naturally, in that arid air most of his survey would be on dry land, where the tule plants would be dead.

 Plaintiff's argument is based upon a misconception of the phrase "tule marsh." The evidence shows that the tule is an annual aquatic plant which can *grow only in a body of water* and that it dies as soon as it is out of water. It then dries up and much of it blows away. Even in the absence of evidence, a court of the Ninth Circuit would have judicial knowledge of this fact. Tule Lake, a large body of fresh water on the Oregon-California boundary, is so named for the great quantity of tule growing in its waters. In the conditions of the flat terrain of the Malheur basin, ordinary high water mark well may be in the middle of an annual growth of tule, starting in the water at a higher water level and dying gradually as the water recedes. In this sense the ordinary high water mark may make a tule swamp in the lake waters.

However, even if the tule did not require to be in water to live and a tule marsh could never have the ordinary high water of a lake in its area, a Malheur Lake meander line in it necessarily must be near its ordinary high water. Assuming the tule marsh border is not in the lake but merely at its shore, and that the meander line through the marsh is not exactly at the lake's ordinary high water mark, still the plaintiff has not maintained its burden of proof discussed above. That is to say, plaintiff has not shown that the area of the marsh between the meander and shore was disproportionate to the 160 or 320 acres of the patents whose plats are bounded by the meander.

 We hold that not only did plaintiff fail to maintain its burden of "conclusive" proof of the Jeems Bayou Club v. United States and other cases cited supra that Neal's plats were not to be deemed parts of the patents, but we agree with the district court that it is shown affirmatively that the meandered border of the plats is a true meander of Malheur Lake and that the patents conveyed the land in the lake bed from their lake boundaries to the lake's center.

E. *Reserve of islands in lake in the lake bottom lands of each patentee.*

■ With regard to the so-called islands above the bed of the lake, it is a question of fact with reference to the lake land conveyed to each of the fourteen patentees whether the island land is of substantial quantity and with its surface permanently above the high water mark. In such lakes as Malheur Lake it is obvious there may be several thousand permanent small projections of land, not surveyed because considered impracticable of reservation. Cf. Moss v. Ramey, 239 U.S. 538, 546, 36 S.Ct. 183, 60 L.Ed. 425, and Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A.,N.S., 107. In this respect the declaratory judgment should be modified to provide for a future determination, with reference to the particular lake lands conveyed by each of the littoral patents, the existence or non-existence of such islands, substantial in quantity and permanent in character at the time of the survey.

F. *There are no findings of fact upon the issue tendered by the adverse claimants.*

■ The adverse claimants offered testimony tending to show their fencing and adverse occupation of lands in the lake bed patented to certain patentees, for a period more than ten years, the statutory period for title by adverse possession in Oregon. Sec. 1-202, Oregon Code 1930. Since these fenced lands are upon these patentees' lands, the adverse claimants are entitled to have their title quieted against both such patentees and the plaintiff. Without making any findings of fact on the issue upon which the evidence was received, the judgment below decided the adverse claimants "held no property rights or rights of any nature to the land in Malheur Division against the United States or any patentee."

In its opinion the court seems to state a principle that if these patentees permitted the plaintiff to administer the bed of the lake as a bird refuge, including the land so fenced, the adverse holding was directed against plaintiff, the United States, against which adverse possession is ineffective. We cannot follow this reasoning. Plaintiff's withdrawal gave it no right, title or interest in these fenced lands on the patented area of the lake bed. The Order by its terms excepted from the bird reservation these lands held by "valid existing rights."

■ If plaintiff be a mere permissive administrator of lands not its own, but of fee simple lands patented to private owners, it is but an agent as to the lands for the private owners. In Oregon, the adverse claimant may mistakenly believe or admit that the United States is the owner of land he has enclosed, yet his adverse possession is good against all private owners. Boe v. Arnold, 54 Or. 52, 59, 102 P. 290, 292, 20 Ann.Cas. 533; Sharpe v. Catron, 67 Or. 368, 371, 136 P. 20, 21; Spath v. Sales, 70 Or. 269, 272, 141 P. 160, 161.

■ The district court erred in making no finding with regard to the character of the adverse possession, and the judgment must be reversed and the case remanded for further consideration as to these adverse claimants.

The judgment below is affirmed in all respects save as to the islands, concerning which it is modified, and as to the adverse claimants, concerning which it is reversed.

Affirmed in part, modified in part, and reversed in part.